CINERAMA, INC., a New York corporation, Plaintiff Below, Appellant,

v.

TECHNICOLOR, INC., a Delaware corporation, Morton Kamerman, Arthur N. Ryan, Fred R. Sullivan, Guy M. Bjorkman, George Lewis, Jonathan T. Isham, MacAndrews & Forbes Group, Incorporated, a Delaware corporation, Macanfor Corporation, a Delaware corporation, and Ronald O. Perelman, Defendants Below, Appellees.

No. 2,1995.

Supreme Court of Delaware.

Submitted: May 23, 1995.

Decided: July 17, 1995.

Rehearing Denied Aug. 16, 1995.

Robert K. Payson, Peter J. Walsh, Jr. and Arthur L. Dent of Potter, Anderson & Corroon, Wilmington, and Gary J. Greenberg (argued), New York City, for appellant Cinerama, Inc.

Rodman Ward, Jr., Thomas J. Allingham, II (argued), David J. Margules, Robert M. Omrod and R. Michael Lindsey of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for appellees MacAndrews & Forbes Group, Inc., Macanfor Corp. and Ronald O. Perelman.

Stephen E. Herrmann, of Richards, Layton & Finger, Wilmington, for appellees Technicolor, Inc., Morton Kamerman, Arthur N. Ryan, Fred R. Sullivan, Guy M. Bjorkman, George Lewis and Jonathan T. Isham.

Before HOLLAND, J., RIDGELY, President Judge,[1] and HORSEY, Justice, Retired.[2]

HOLLAND, Justice:

Today's opinion completes a trilogy of decisions by this Court. The case involves claims by the plaintiff-appellant, Cinerama, Inc. ("Cinerama"), against the directors of Technicolor, Inc. ("Technicolor") and others. The issues presented relate to the sale of

**1.** Sitting by designation pursuant to Del. Const. art. IV, § 12.

**2.** Sitting by designation pursuant to Del. Const. art. IV, §§ 12 and 38.

Technicolor to MacAndrews & Forbes Group, Inc. ("MAF") in a two-stage tender offer/merger transaction for $23 per share in cash. Cinerama was at all times the owner of 201,200 shares of the common stock of Technicolor, representing 4.405 percent of the total shares outstanding.

Cinerama did not tender its stock in the first stage of the MAF acquisition, which commenced on November 4, 1982. Cinerama dissented from the second stage merger, which was completed on January 24, 1983. After dissenting, Cinerama petitioned the Court of Chancery in March 1983 for an appraisal of its shares pursuant to 8 *Del.C.* § 262. During pretrial discovery in the appraisal proceedings, certain deposition testimony caused Cinerama to believe that the directors of Technicolor had failed to comply with their fiduciary duties in connection with the sale of the company.

In January 1986, Cinerama filed a personal liability action in the Court of Chancery against Technicolor, seven of the nine members of the Technicolor board of directors at the time of the merger, MAF, Macanfor and Ronald O. Perelman ("Perelman"). Perelman was MAF's board chairman and controlling shareholder. Cinerama's personal liability action alleged fraud, breach of fiduciary duty and unfair dealing. It included a claim for rescissory damages and other relief.[3]

## FIRST APPEAL

The defendants in the personal liability action filed a motion to dismiss on the ground that Cinerama had no standing to pursue such a claim after petitioning for an appraisal of its shares. The Court of Chancery denied the motion, but ruled that after discovery was completed, Cinerama would have to elect which cause of action it intended to pursue.

**3.** Cinerama also contended that the merger was void *ab initio* because it violated a supermajority provision in Technicolor's charter that required either unanimous director approval or a ninety-five percent vote of the shareholders. In *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 634 A.2d 345 (1993), this Court affirmed the Court of Chancery's "rejection of Cinerama's claim that the merger was void *ab initio* because [a director] had cast an opposing vote." *Id.* at 371–72.

*See Cede & Co. v. Technicolor, Inc.*, Del.Ch., C.A. Nos. 7128, 8358, 1987 WL 4768 (Jan. 13, 1987).[4] Cinerama filed an interlocutory appeal to this Court. *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 542 A.2d 1182 (1988) ("*Cede I* ").

In *Cede I*, this Court held that the Court of Chancery had erred, as a matter of law, in requiring Cinerama to make an election of remedies before trial. We held that Cinerama was entitled to pursue concurrently, *through trial*, its appraisal action and its personal liability action. This Court then remanded the case to the Court of Chancery for a trial of those consolidated actions. *Id.* at 1192.

## SECOND APPEAL

Following further discovery and an extended trial, the Court of Chancery announced its decision in the appraisal action first. In its "appraisal opinion" dated October 19, 1990, the Court of Chancery found the fair value of the dissenting shareholders' Technicolor stock to be $21.60 per share as of the date of the merger, January 24, 1983. *Cede & Co. v. Technicolor, Inc.*, Del.Ch., C.A. No. 7129, 1990 WL 161084 (Oct. 19, 1990).

In June 1991, the Court of Chancery issued its "personal liability opinion," in which it found persuasive evidence that the defendant Technicolor directors had breached their fiduciary duties. *Cinerama v. Technicolor, Inc.*, Del.Ch., C.A. No. 8358, 1991 WL 111134 (June 24, 1991).[5] Nevertheless, the Court of Chancery entered judgment for the defendants in the personal liability action. According to the Court of Chancery, even if the defendant directors had not exercised due care in approving the merger, Cinerama had failed to prove that it had been damaged.[6] *Id.* In reaching that conclusion, the

**4.** This opinion is reprinted in 13 Del.J.Corp.L. 225 (1988).

**5.** This opinion is reprinted in 17 Del.J.Corp.L. 551 (1992).

**6.** The Court of Chancery also found no merit in Cinerama's further claims: that the merger was void *ab initio;* that the Technicolor board of directors had breached its duty of disclosure in its 14D–9 filing and proxy statement; and that MAF and Perelman, on becoming controlling

Court of Chancery relied upon its valuation in its earlier appraisal opinion.

Cinerama appealed from the judgments entered in both the appraisal action and the personal liability action. *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345 (1993), *on reargument,* 636 A.2d 956 (1994) (*"Cede II "*). In the personal liability action, this Court affirmed in part, reversed in part, and remanded to the Court of Chancery for an application of the entire fairness standard to the challenged transaction, and to resolve certain additional issues relating to the duty of loyalty. Because of our determination in the personal liability action, this Court did not decide Cinerama's appeal in the appraisal action.

## THIS APPEAL

On remand, the Court of Chancery concluded that the defendants had met their burden of showing entire fairness, resolved the additional loyalty issues posited by this Court in *Cede II,* and entered judgment for the defendants. *Cinerama, Inc. v. Technicolor, Inc.,* Del.Ch., C.A. No. 8358 (Oct. 6, 1994, *revised* Oct. 12, 1994, *revised* Oct. 18, 1994), *reprinted in* 20 Del.J.Corp.L. 277, 663 A.2d 1134 (1995) (hereinafter *Cinerama,* 663 A.2d 1134). Cinerama filed a notice of appeal on January 4, 1995. In this second post-trial appeal, Cinerama alleges that: (1) the Court of Chancery's failure to follow the rulings of this Court in *Cede I* and *Cede II* violated the mandate rule, as well as the law of the case doctrine; (2) the Court of Chancery erred in relitigating the duty of care issues; (3) the Court of Chancery improperly imposed upon Cinerama the burden of proving entire fairness; (4) the director defendants failed to carry their burden of proving that the plan of merger was entirely fair; (5) the Court of Chancery improperly refused to accept this Court's rejection of its reasonable person standard for determining the materiality of director conflicts and, under an appropriate test, a majority of the director defendants was burdened by material conflicts or otherwise lacked independence; (6)

alternatively, the domination of the negotiation and consideration of the merger agreement by directors burdened by material conflicts was sufficient to establish a breach of the duty of loyalty; (7) alternatively, the failure of interested directors to disclose fully all material conflicts was sufficient to establish a breach of the duty of loyalty; (8) alternatively, director Fred R. Sullivan's ("Sullivan") bad faith disloyalty was of such material significance that his conduct alone was sufficient to establish a breach of the duty of loyalty; (9) the Court of Chancery failed to consider the purpose and intent of Article Tenth of the Technicolor charter; (10) the defendants violated the duty of disclosure by failing to inform the shareholders of director Arthur N. Ryan's ("Ryan") material self-interest; (11) the MAF defendants were liable to Cinerama as aiders and abetters of the director defendants' breaches of fiduciary duty; (12) the Court of Chancery erred, as a matter of law, in holding that rescissory damages were not available; and (13) the Court of Chancery should have found all of the defendants jointly and severally liable to pay rescissory damages to Cinerama of $32.8 million as of October 7, 1988, with interest, as well as to reimburse Cinerama for counsel fees and expert witness costs.

This Court has concluded the Court of Chancery's decision that the Technicolor sale was entirely fair to the shareholders and its judgment in favor of the defendants should be affirmed. Consequently, the questions framed by issues (12) and (13) above, and the Court of Chancery's discussion and determinations regarding damages, are not relevant in this appeal. Accordingly, this Court will neither address nor decide any of the damage issues raised on appeal.

In the following opinion this Court: first, reviews certain general principles relating to the procedural and substantive aspects of the business judgment rule and the substantive entire fairness standard; second, reviews the purpose of the remand in *Cede II* and distinguishes the remand in this case from that in *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858 (1985); third, addresses the Court of

shareholders of Technicolor, had breached fiduciary duties owed to Cinerama. This Court af-

firmed those rulings in *Cede II,* 634 A.2d at 371–73.

Chancery's resolutions of the loyalty issues this Court remanded for consideration in *Cede II;* fourth, examines the Court of Chancery's conclusions concerning the substantive entire fairness of the sale of Technicolor to MAF according to the precepts articulated in *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701 (1983) and its progeny; and finally, affirms the Court of Chancery's judgment in favor of the defendants, pursuant to this Court's controlling and deferential standard of appellate review.

## FACTS

The facts of this case are recited at length in this Court's opinion following the first post-trial appeal. *Cede II,* 634 A.2d at 351–58. After our decision in *Cede II,* the parties stipulated to submit the remanded issues to the Court of Chancery without presenting any additional evidence.[7] Therefore, this Court will rely upon its prior recitation of the facts. The facts relevant to this appeal will be addressed in the opinion in the context of the issues that we have found to be dispositive.

## BUSINESS JUDGMENT REBUTTED EVIDENTIARY BURDEN SHIFTS ENTIRE FAIRNESS STANDARD APPLIES

██ The business judgment rule "operates as *both* a procedural guide for litigants and a substantive rule of law." *Cede II,* 634 A.2d at 360 (quoting *Citron v. Fairchild Camera & Instrument Corp.,* Del.Supr., 569 A.2d 53, 64 (1989) (emphasis added)); *see Unitrin, Inc. v. American Gen. Corp.,* Del.Supr., 651 A.2d 1361 (1995). As a *procedural* guide the business judgment presumption is a *rule of evidence* that places the initial burden of proof on the plaintiff. In *Cede II,* this Court described the rule's evidentiary, or procedural, operation as follows:

> If a shareholder plaintiff fails to meet this evidentiary burden, the business judgment rule attaches to protect corporate officers and directors and the decisions they make, and our courts will not second-guess these

business judgments. *See, e.g.,* [*Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d at 64; *Smith v. Van Gorkom,* 488 A.2d at 872]; *see also* 8 *Del.C.* § 141(a). If the rule is rebutted, the burden shifts to the defendant directors, the proponents of the challenged transaction, to prove to the trier of fact the "entire fairness" of the transaction to the shareholder plaintiff. *Nixon v. Blackwell,* Del.Supr., 626 A.2d 1366, 1376 (1993); [*Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261 (1989) ]; *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 710 (1983).

*Cede II,* 634 A.2d at 361.

██ Burden shifting does not create *per se* liability on the part of the directors. *Id.* at 371. Rather, it "is a procedure by which Delaware courts of equity determine under what standard of review director liability is to be judged." *Id.* In remanding this case for review under the entire fairness standard, this Court expressly acknowledged that its holding in *Cede II* did *not* establish liability. *Id.; accord Nixon v. Blackwell,* Del. Supr., 626 A.2d 1366, 1381 (1993).

██ Where, as in this case, the presumption of the business judgment rule has been rebutted, the board of directors' action is examined under the entire fairness standard. *Unitrin, Inc. v. American Gen. Corp.,* 651 A.2d at 1371 n. 7 (collecting cases). This Court has described the dual aspects of entire fairness, as follows:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.... How-

---

7. The parties did brief and argue their respective positions regarding the issues that this Court had remanded to the Court of Chancery.

ever, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.

*Weinberger v. UOP, Inc.*, 457 A.2d at 711. Thus, the entire fairness standard requires the board of directors to establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cede II*, 634 A.2d at 361. In this case, because the contested action is the sale of a company, the "fair price" aspect of an entire fairness analysis requires the board of directors to demonstrate "that the price offered was the highest value reasonably available under the circumstances." *Id.*

■ Because the decision that the *procedural* presumption of the business judgment rule has been rebutted does not establish *substantive* liability under the entire fairness standard, such a ruling does not necessarily present an insurmountable obstacle for a board of directors to overcome. Thus, an initial judicial determination that a given breach of a board's fiduciary duties has rebutted the presumption of the business judgment rule does not preclude a subsequent judicial determination that the board action was entirely fair, and is, therefore, not outcome-determinative *per se*.[8] *Id.* at 371; *accord Nixon v. Blackwell*, 626 A.2d at 1381. To avoid substantive liability, *notwithstanding* the quantum of adverse evidence that has defeated the business judgment rule's protective procedural presumption, the board will have to demonstrate entire fairness by presenting evidence of the cumulative manner

by which it otherwise discharged all of its fiduciary duties.

■ Although the *procedural* decision to shift the evidentiary burden to the board of directors to show entire fairness does not create liability *per se*, the aspect of fair dealing to which *Weinberger* devoted the most attention—*disclosure*—has a unique position in a *substantive* entire fairness analysis. *See, e.g., In re Tri–Star Pictures, Inc. Litig.*, Del.Supr., 634 A.2d 319, 331–32 (1993); *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 937 (1985). A combination of the fiduciary duties of care and loyalty[9] gives rise to the requirement that "a director disclose to shareholders all material facts bearing upon a merger vote...."[10] *Zirn v. VLI Corp.*, Del.Supr., 621 A.2d 773, 778 (1993). Moreover, in Delaware, "existing law and policy have evolved into a virtual *per se* rule of [awarding] damages for breach of the fiduciary duty of disclosure."[11] *In re Tri–Star Pictures, Inc. Litig.*, 634 A.2d at 333.

### PURPOSE OF REMAND

Several of the contentions Cinerama raises in this appeal relate to the manner in which the Court of Chancery proceeded upon remand. According to Cinerama, the Court of Chancery disregarded this Court's mandate and the law of the case. Therefore, it is appropriate to begin this opinion by setting forth why this matter was remanded to the Court of Chancery and what further action was contemplated by this Court.

In *Cede II*, this Court reiterated that a shareholder plaintiff challenging a board de-

---

**8.** Nevertheless, this Court has noted that "[b]ecause the effect of the proper invocation of the business judgment rule is so powerful and the standard of entire fairness so exacting, the determination of the appropriate standard of judicial review frequently is determinative of the outcome of [the] litigation." *Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261, 1279 (1989) (quoting *AC Acquisitions Corp. v. Anderson, Clayton & Co.*, Del.Ch., 519 A.2d 103, 111 (1986)).

**9.** This Court has recently held that a violation of the duty of disclosure is not necessarily a breach of the duty of loyalty. *Arnold v. Society for Savings Bancorp, Inc.*, Del.Supr, 650 A.2d 1270, 1287–88 (1994).

**10.** This Court has recognized that "Delaware law imposes upon a board of directors the fiduciary duty to disclose fully and fairly all material facts within its control that would have a significant effect upon a stockholder vote." *Stroud v. Grace*, Del.Supr., 606 A.2d 75, 85 (1992).

**11.** In *Arnold*, this Court held that "claims alleging disclosure violations that do not otherwise fall within any exception are protected by Section 102(b)(7) and any certificate of incorporation provision ... adopted pursuant thereto." *Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d at 1287.

cision has the initial burden of rebutting the presumption of the business judgment rule. *Cede II*, 634 A.2d at 361. This Court held that to rebut the presumption, a shareholder plaintiff assumes the burden of providing evidence that the *board* of directors, in reaching *its* challenged decision, breached any *one* of *its* triad of fiduciary duties: good faith, loyalty, or due care. *Id.* The issues presented on appeal in *Cede II* related to two of those fiduciary obligations: the duty of care and the duty of loyalty. *Id.* at 359.[12]

In *Cede II*, this Court held that "the record evidence establishes that Cinerama met its burden of proof for overcoming the [business judgment] rule's presumption of board duty of care in approving the sale of [Technicolor] to MAF." *Id.* at 367.[13] This Court then specifically stated that, *as a rule of evidence,* "[b]urden shifting does not create *per se* liability on the part of the directors...." *Id.* at 371. Accordingly, this Court remanded the case to the Court of Chancery "with directions to apply the entire fairness standard of review to the challenged transaction." *Id.*

With regard to the *duty of loyalty*, this Court stated that the following issues would require resolution on remand:

> (1) the precise standard of proof required under the second part of the materiality standard ...; (2) the legitimacy of such a standard under Delaware law and the relevance of section 144(a); (3) the effect of the unanimity requirement in Technicolor's charter on the duty of loyalty standard controlling this case; and (4) the consequence of an affirmance of the decision below finding no breach of the duty of disclosure on the question of director self-interest.

*Id.* at 366.

In this appeal, Cinerama argues that "under established principles of Delaware law,

because a majority of the board bears the taint of self-interest or lack of independence, the director defendants lost the business judgment rule presumption of loyalty so that they were obligated to establish the entire fairness of the transaction even if they had not breached their duty of care." That specific argument is, of course, academic because this Court *did* hold that the Technicolor board of directors had lost that presumptive protection of the business judgment rule by breaching its duty of care and was, therefore, already required to demonstrate the entire fairness of the transaction. *Id.* at 361. From a procedural perspective, the breach of any *one* of the board's fiduciary duties is enough to shift the burden of proof to the board to demonstrate entire fairness. *Id.*

Why were the loyalty issues remanded if their *procedural* relevance had become moot as a consequence of this Court's holding that the business judgment rule's presumption had been rebutted by a violation of the duty of care? In a given case, the Court of Chancery can, but is not required to, find that independent and adequate alternative breaches of fiduciary duty have rebutted the presumptive protection of the business judgment rule and, thus, mandate an entire fairness analysis. Nevertheless, or irrespective of the particular breach or breaches of fiduciary duty that constituted the basis for shifting the *procedural* burden of proof to the board, *each* of the fiduciary duties retains independent *substantive* significance in an entire fairness analysis.[14]

Evidence regarding the manner in which the board otherwise discharged all three of its primary fiduciary duties has probative *substantive* significance throughout an entire fairness analysis,[15] and by necessity must

---

**12.** In its appeal in *Cede II*, Cinerama abandoned "its claim that the directors acted in bad faith." *Cede II*, 634 A.2d at 359.

**13.** "The duty of the directors of a company to act on an informed basis ... forms the duty of care element of the business judgment rule." *Id.* at 367.

**14.** The Court of Chancery properly observed on remand: "While in this case the effect of the

'business judgment rule' has been held to have been exhausted and its presumption no longer of any consequence, the law of fiduciary duties of corporate directors is older and more basic than the modernly popular 'business judgment rule.' " *Cinerama*, 663 A.2d at 1141.

**15.** In *Rabkin v. Philip A. Hunt Chem. Corp.*, Del. Supr., 498 A.2d 1099 (1985), this Court explicitly rejected a limiting interpretation of fair dealing.

permeate the analysis, for two reasons. First, since the evidence that defeated the *procedural* presumption of the business judgment rule does not establish liability *per se*, a *substantive* finding of entire fairness is only possible after examining and balancing the nature of the duty or duties the board breached *vis-a-vis* the manner in which the board properly discharged its other fiduciary duties. Second, the determination that a board has failed to demonstrate entire fairness will be the basis for a finding of *substantive* liability. The Court of Chancery must identify the breach or breaches of fiduciary duty upon which that liability will be predicated in the *ratio decidendi* of its determination that entire fairness has not been established.[16]

Accordingly, this Court remanded the issues of loyalty to the Court of Chancery, even though the found breach of the duty of care had already procedurally mandated an entire fairness examination. *See Cede II*, 634 A.2d at 371; *accord In re Tri–Star Pictures Inc. Litig.*, 634 A.2d at 333. The purpose for remanding Cinerama's breach of loyalty contentions in this case was for the Court of Chancery to examine those issues within the *substantive* context of the fair dealing component of its entire fairness analysis. A determination that the Technicolor directors had breached the duty of loyalty in dealing with the shareholders might well have prevented a finding of entire fairness.[17]

## VAN GORKOM REMAND DISTINGUISHED

This Court's instructions on remand in *Cede II* were not identical to those in *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985). In *Cede II*, this Court held that the directors' breach of the duty of care had rebutted the presumption of the business

---

The Court of Chancery had limited the inquiry to disclosure issues. We held:
> [T]he trial court's narrow interpretation of *Weinberger* would render meaningless our extensive discussion of fair dealing found in that opinion. In *Weinberger* we defined fair dealing as embracing "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." While this duty of fairness certainly incorporates the principle that a cash-out merger must be free of fraud or misrepresentation, *Weinberger's* mandate of fair dealing does not turn solely on issues of deception. We particularly noted broader concerns respecting the matter of procedural fairness.

*Id.* at 1104–05 (citations omitted).

16. If the board fails to demonstrate entire fairness, the particular breach or breaches of fiduciary duty upon which substantive liability is based currently has great significance because of the provisions for eliminating or limiting liability set forth in 8 *Del.C.* § 102(b)(7). *See Arnold v. Society for Savings Bancorp, Inc.*, Del.Supr., 650 A.2d 1270, 1287 (1994). Section 102(b)(7) provides:

> § **102. Contents of certificate of incorporation.**
> (b) In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters:
> (7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. No such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision becomes effective. All references in this paragraph to a director shall also be deemed to refer (x) to a member of the governing body of a corporation which is not authorized to issue capital stock, and (y) to such other person or persons, if any, who, pursuant to a provision of the certificate of incorporation in accordance with § 141(a) of this title, exercise or perform any of the powers or duties otherwise conferred or imposed upon the board of directors by this title.

8 *Del.C.* § 102.

17. This case involves pre-*Van Gorkom* conduct but did not reach this Court until eight years after *Van Gorkom* was decided. The Technicolor directors were exposed to personal liability in this action because the transaction pre-dated the Delaware legislature's adoption of 8 *Del.C.* § 102(b)(7). Even that provision, however, does not provide protection against a breach of the duty of loyalty.

judgment rule. *Cede II*, 634 A.2d at 371. However, in *Cede II*, this Court *did not* decide unresolved issues concerning Cinerama's allegations that the directors had violated the duty of loyalty. *Id.* at 366. As to Cinerama's disclosure claims, this Court affirmed the Court of Chancery's rejection of Cinerama's contentions. *Id.* at 373. Nevertheless, this Court raised additional questions, *sua sponte*, for the Court of Chancery to address on remand regarding whether the Technicolor board had violated its duty of disclosure, an obligation that has been characterized as a derivative of the duties of care and loyalty. *Id.; see Zirn v. VLI Corp.*, Del.Supr., 621 A.2d 773 (1993); *see also Arnold v. Society for Savings Bancorp, Inc.*, Del.Supr., 650 A.2d 1270 (1994). This Court remanded those issues for the Court of Chancery to address in the first instance, as part of its entire fairness analysis.

In *Van Gorkom*, this Court concluded that the board of directors' failure to inform itself before recommending a merger to the stockholders constituted a breach of the fiduciary duty of care and rebutted the presumptive protection of the business judgment rule. *Smith v. Van Gorkom*, 488 A.2d at 893. In *Van Gorkom*, this Court *also* concluded that the directors had violated the *duty of disclosure*. This Court then held that the directors were liable for damages, since the record after trial reflected that the compound breaches of the duties of care and *disclosure* could not withstand an entire fairness analysis.[18] *Id.; accord In re Tri–Star Pictures, Inc. Litig.*, Del.Supr. 634 A.2d 319 (1993). Consequently, because this Court had decided the *substantive* entire fairness issue adversely to the board in *Van Gorkom*, the only issue to remand was the amount of damages the Court of Chancery should assess in accordance with *Weinberger*.

Whereas in *Van Gorkom* liability was decided *before* remand, in this case, a condition

precedent to a finding of liability was an adverse determination regarding entire fairness *after* remand. This explains this Court's discussion in *Cede II* of *Barnes v. Andrews*, 298 F. 614, 616–18 (S.D.N.Y.1924). *Cede II*, 634 A.2d at 370–71. This Court rejected the proof of injury requirement in *Barnes* because:

> To inject a requirement of proof of injury into the [business judgment] rule's formulation for burden shifting purposes is to lose sight of the underlying purpose of the rule. Burden shifting does not create *per se* liability on the part of the directors; rather, it is a procedure by which Delaware courts of equity determine under what standard of review director liability is to be judged. To require proof of injury as a component of the proof necessary to rebut the business judgment presumption would be to convert the burden shifting process from a threshold determination of the appropriate standard of review to a dispositive adjudication on the merits.

*Id.* at 371.

Consequently, in *Cede II* this Court held that injury or damages becomes a proper focus only after a transaction is determined *not* to be entirely fair. *Id.* At that point, the measure of damages for *any* breach of fiduciary duty, under an entire fairness standard of review, is "not necessarily limited to the difference between the price offered and the 'true' value as determined under the appraisal proceedings. Under *Weinberger*, the [Court of Chancery] 'may fashion any form of equitable and monetary relief as *may* be appropriate, including rescissory damages.'" *Id.* (emphasis added) (citation omitted). Thus, this Court concluded that "the tort principles of *Barnes* have no place in a business judgment rule standard of review analysis." *Id.* at 370.[19]

---

**18.** In *Van Gorkom*, it was unnecessary for this Court to state whether the disclosure violation constituted a breach of the duty of care or loyalty or was a combined breach of both since 8 *Del.C.* § 102(b)(7) had not yet been enacted. The statute was, in fact, a legislative response to this Court's liability holding in *Van Gorkom. See also Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d at 1287.

**19.** While this Court noted that *Barnes* may still be "good law," it is not a business judgment rule case. *Barnes* is more analogous to oversight cases. *See Lutz v. Boas*, Del.Ch., 171 A.2d 381, 396 (1961); *see also Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 813 n. 7 (1984).

## DUTY OF LOYALTY
## ISSUES ON REMAND

The Court of Chancery assiduously followed this Court's mandate to address specific matters regarding the independence and disinterest of Technicolor's board of directors. The Court of Chancery described its task as follows:

I now turn to an attempt to follow the Supreme Court's directions with respect to the Technicolor board's independence and disinterest.... First, I revisit the issue of what standard should be applied to determine whether an individual director is interested in a transaction. Next, I address the test determining whether the board as a whole has been tainted by the existence of one or more interested directors. Finally, I consider the effect, if any, the Technicolor's charter provision requiring directorial unanimity has upon the duty of loyalty.

*Cinerama,* 663 A.2d at 1150. The manner in which each loyalty issue was resolved will be reviewed *seriatim.*

### Materiality
### Standard and Legitimacy

This Court asked the Court of Chancery to resolve two issues relating to the "second part" [20] of the director interest materiality test: (1) the precise standard of proof required; and (2) the legitimacy of such a standard under Delaware law and the relevance of Section 144(a). *Cede II,* 634 A.2d at 366. The Court of Chancery began by acknowledging that this Court's rejection of the objective "reasonable director" formulation required it to apply a different standard upon remand for determining when an *individual* director's financial interest is material, before it addressed the remanded question of *board* independence.[21]

■ The Court of Chancery reasoned that the logical alternative was a subjective "actual person" standard. We agree. The subjective standard is consistent with this Court's observation, in *Cede II,* that requiring a shareholder plaintiff to show "the materiality of a director's self-interest to the *given* director's independence" was a "restatement of established Delaware law." *Id.* at 363 (emphasis added).

The Court of Chancery stated that "[u]nder such a test of materiality [it] would be required to determine *not* how or whether a reasonable person in the same or similar circumstances ... would be affected by a financial interest of the same sort as present in the case, but whether *this* director in fact was or would likely be affected." *Cinerama,* 663 A.2d at 1151. Thus, the "actual person" test requires an independent judicial determination regarding the materiality of the *"given"* director's self-interest. Applying the "actual person" test, the Court of Chancery examined the record for evidence that any of the allegedly conflicted directors had "some special characteristic that [made] him ... especially susceptible to or immune to opportunities for self-enrichment or ... evidence that [any of such directors] in fact behaved differently in this instance than one would expect a reasonable person in the same or similar circumstances to act." *Id.* at 1151.

Cinerama contended on remand, and continues to contend in this appeal, that five of Technicolor's nine directors were "disabled" by conflicts of interest. The Court of Chancery, however, found every director, except Sullivan, to be free of any material conflict:

I have already stated my conclusion that with the exception of Mr. Sullivan, and potentially Mr. Ryan, none of the other Technicolor directors labored under a conflict of interest which would have been material to a reasonable person. On this remand I further conclude here that there is no persuasive evidence that any of the directors were, in fact, materially influenced in their negotiations by any self-interest they may have had.

*Id.* at 1150.

The Court of Chancery concluded that, "with respect to *each* of the corporate directors treated in this court's opinion; analy-

---

20. The "first part" of the materiality test was addressed in *Cede II,* 634 A.2d at 363–64.

21. In *Cede II,* this Court noted its concern that the reasonable person standard lacks precision. *Id.* at 364 n. 31.

sis of actual interference with the directors' good faith judgment seeking the shareholders' best benefit does not produce a different result than does the 'reasonable person' analysis." *Id.* at 1152 (emphasis added). Thus, after applying the enhanced scrutiny required by the subjective "actual person" standard, the Court of Chancery reached the same determinations regarding the materiality of the alleged *individual* director self-interests as it had previously by applying the objective "reasonable person" standard.[22] *Id.* Those conclusions, as to each director, are supported by the record.

The Court of Chancery then addressed the remanded issue of *board* independence. The Court of Chancery framed the issue as follows:

> Has the presence of the found material self-interest of one or more directors on the board that acted upon a transaction so infected or affected the deliberative process of the board as to disarm the board of its presumption of regularity and respect and cast upon the directors the burden (and the heightened risks . . .) of the entire fairness form of judicial review.

*Id.* at 1153; *see In re Tri–Star Pictures, Inc. Litig.,* Del.Supr., 634 A.2d 319 (1993); *Rales v. Blasband,* Del.Supr., 634 A.2d 927 (1993). The Court of Chancery assumed that if actual self-interest is present and affects a majority of directors approving a transaction, the entire fairness standard applies.

■ The Court of Chancery concluded that a material interest of "one or more directors less than a majority of those voting" would rebut the application of the business judgment rule if the plaintiff proved

that "the interested director *controls* or *dominates* the board as a whole or [that] the interested director *fail[ed] to disclose his interest* in the transaction to the board *and* a reasonable board member would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction." *Cinerama,* 663 A.2d at 1153. We hold that the Court of Chancery's conclusion is correct, as a matter of law. Thus, we affirm its ruling on the effect of director material self-interest as it was related to the requirement of board independence.

The Court of Chancery then framed and answered the loyalty issues with respect to the procedural question of whether the evidentiary presumption of the business judgment rule had been rebutted and, therefore, the entire fairness standard applied. In this case, that particular question was moot because this Court had already held in *Cede II* that the entire fairness standard applied to the Technicolor sale. The Court of Chancery's findings concerning loyalty, however, have probative value within the substantive entire fairness analysis. The Court of Chancery's materiality formulation, as well as its application, are consistent with Delaware's *procedural* and *substantive* law.

### Technicolor Board Loyal

■ The Court of Chancery found as an ultimate fact regarding the issues of loyalty that "a large majority of the board of Technicolor was disinterested and independent with respect to this transaction and neither of those two directors found [Sullivan] or assumed [Ryan] to be interested, dominated or manipulated the process of board consider-

---

**22.** The Court of Chancery commented:

> In candor this is unsurprising. On the contrary if a judge employing a reasonable person standard concluded that in fact a director's judgment *was* affected by a factor or interest *that would not have affected a reasonable person,* it would be surprising if he would conclude that nevertheless there was no material conflict. The advantage of the reasonable person standard is that it does not call upon the court to evaluate the effect of eccentricities but leaves the question of materiality as an "objective" matter. But if the evidence shows that

> an "objectively" immaterial conflicting interest *in fact* did have a significant impact on the particular directors in question, there is room in the "independence" prong of the analysis to give that fact a disqualifying effect insofar as that director is concerned and one would expect a trial court to avoid obvious injustice by doing so. Thus while the June 21 opinion spoke in terms of a "reasonable person" and did not express that in fact these claimed interests did not interfere with the process to achieve stockholder's welfare, that was my belief.

> *Cinerama,* 663 A.2d at 1152.

ation. *See Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34 (1994)."[23] That finding must be affirmed as supported by the record. It is also the product of an orderly and logical deductive process. *Levitt v. Bouvier,* Del. Supr., 287 A.2d 671, 673 (1972); *see also Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 937 (1985).

### Section 144(a)'s Relevance

 In accordance with this Court's mandate, the Court of Chancery then considered the relevance of 8 *Del.C.* § 144(a) to this case. The concern Section 144 addresses is self-dealing; for example, when a director deals directly with the corporation, or has a stake in or is an officer or director of a firm that deals with the corporation. *See* 8 *Del.C.* § 144(a); *see also Cheff v. Mathes,* Del.Supr., 199 A.2d 548, 554 (1964). Traditionally, the term "self-dealing" describes the "situation when a [corporate fiduciary] is on both sides of a transaction...." *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717, 720 (1971). In *Cede II,* this Court distinguished classic self-dealing from incidental director interest. To be disqualifying, the nature of the director interest must be substantial. *Cede II,* 634 A.2d at 362–63; *accord Citron v. Fairchild Camera & Instrument Corp.,* Del. Supr., 569 A.2d 53, 64 (1989).

The Court of Chancery properly began its consideration of Section 144 with the following comment:

> [Section 144] does not deal with the question of when will a financial interest of one or more directors cast on the board

the burdens and risks of the entire fairness form of judicial review. Rather it deals with the related problem of the conditions under which a corporate contract can be rendered "un-voidable" solely by reason of a director interest. These two problems— when will a director interest replace the business judgment form of review with the entire fairness form of review and when are interested contracts not necessarily voidable—are related in that both focus upon an affect of action by an "independent" corporate decision maker. But as construed by our Supreme Court recently compliance with the terms of Section 144 does not restore to the board the presumption of the business judgment rule; it simply shifts the burden to plaintiff to prove unfairness. *See Kahn v. Lynch Communication Systems,* Del.Supr., 638 A.2d 1110 (1994).

> The inquiry whether a board is independent and disinterested, etc. for purposes of determining whether it qualified for the business judgment rule presumption is somewhat similar to this Section 144 analysis but can't be the same, since the business judgement form of review analysis inquiry must admit of the possibility that, if there is no material interference with the independence of the board's process, that business judgment review is possible.

*Cinerama,* 663 A.2d at 1154.

In this appeal, Cinerama acknowledges that Section 144 is not directly applicable to this case.[24] Nevertheless, according to Cinerama, by analogy the safe harbor provisions in Section 144(a) for *disclosed* financial inter-

---

**23.** This quote contains language from the Court of Chancery's October 18, 1994 revision of its opinion. The original language, prior to revision, can be found at *Cinerama,* 663 A.2d at 1150.

**24.** In a footnote in its opening brief in this appeal, Cinerama states:

> On its face, Section 144 applies only to contracts or transactions between (i) a corporation and one or more of its directors or officers, or (ii) a corporation and any other corporation or entity in which there are directors or officers in common or in which the directors or officers have a financial interest. Here the merger was neither a transaction between Techni-

color and its directors nor between Technicolor and another corporation in which any of the Technicolor directors were directors, officers, or had a financial interest. Although interests of a financial nature existed, those interests resulted *from the transaction itself.* Such interests are not contemplated by the statute. By its terms Section 144 would only apply if Kamerman, Sullivan, Ryan and the others had a financial interest in MAF....

> Moreover, the statute speaks only to "financial interests" and conflicts arising from fiduciaries appearing on both sides of the transaction. On its face the statute does not encompass transactions tainted by influences affecting a director's independence....

ests would not apply in this case because, allegedly, "many of the material conflicts were not disclosed."

 When a board of directors' loyalty is questioned, Delaware courts determine whether a conflict has deprived stockholders of a "neutral decision-making body." *Oberly v. Kirby,* Del.Supr., 592 A.2d 445, 467 (1991).[25] In *Oberly,* this Court explained:

The fact that some interested transactions are permitted under our corporate law demonstrates that they are not inherently detrimental to a corporation. As long as a given transaction is fair to the corporation, and no confidential relationship betrayed, it may not matter that certain corporate officers will profit as the result of it.... The key to upholding an interested transaction is the approval of some neutral decision-making body. Under 8 *Del.C.* § 144, a transaction will be sheltered from shareholder challenge if approved by either a committee of independent directors, the shareholders, or the courts.

*Id.* In *Oberly,* even though Section 144(a) did not apply to the action being contested, this Court relied upon the provisions in that statute to illustrate the general principle that, as to the duty of loyalty, approval of a transaction by a board of which a majority of directors is disinterested and independent "bring[s] it within the scope of the business judgment rule." *Id.* at 466.

Similarly, notwithstanding Section 144(a)'s inapplicability to this case, the Court of Chancery concluded that its "materiality" approach to individual director interest and board independence "is highly consistent with" the policy of Section 144. The Court of Chancery then concluded that "the interest of Mr. Sullivan was disclosed and a majority of the non-interested directors approved the transaction in good faith." *Cinerama,* 663

A.2d at 1154. As to the assumed interest of Mr. Ryan, the Court of Chancery concluded that, pursuant to the language of the statute, "the alleged hope of better employment opportunities does not constitute the kind of interest covered by Section 144." *Id.* We agree with each of the Court of Chancery's conclusions.

## Unanimity Requirement Technicolor Charter Satisfied

 The Court of Chancery next addressed the effect of the unanimity requirement in Technicolor's charter on the duty of loyalty standard controlling this case. In *Cede II,* this Court found a "further significant issue that neither the parties nor the court below ha[d] addressed; that is, the relevance of Technicolor's charter requirement of director unanimity to the consequence of a finding of director self-interest." *Cede II,* 634 A.2d at 365. This Court posed the following questions on remand:

If unanimity is required, will one director's self-interest or lack of independence violate the requirement? Do the provisions of Section 144 override a charter requirement of unanimity? Does full disclosure of a director's interest to an otherwise disinterested board satisfy Technicolor's unanimity requirement?

*Id.* at 366 (footnotes omitted). After answering the first question in the negative, the Court of Chancery found the remaining questions to be moot.

Cinerama argues that the Technicolor merger is voidable because allegedly interested directors participated in the unanimous vote to recommend the repeal of Technicolor's supermajority provision. The Technicolor certificate of incorporation included a supermajority provision that required a ninety-five percent stockholder vote to approve a merger with any entity holding twenty per-

---

**25.** A board of which a majority of directors is interested is not a "neutral decision-making body." *See, e.g., Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34, 42 n. 9 (1994) ("[w]here actual self-interest is present and affects a majority of the directors approving a transaction, a court will apply [the entire fairness test]"); *Aronson v. Lewis,* Del. Supr., 473 A.2d 805, 812 (1984). A majority of

disinterested directors is not "independent" if that majority was dominated by an interested director. *See Heineman v. Datapoint Corp.,* Del. Supr., 611 A.2d 950, 955 (1992). Similarly, the manipulation of the disinterested majority by an interested director vitiates the majority's ability to act as a neutral decision-making body. *See Mills Acquisition Co. v. Macmillan, Inc.,* Del. Supr., 559 A.2d 1261, 1279 (1989).

cent or more of Technicolor's stock on the record date for the merger vote. The certificate further provided that the supermajority provision could not be repealed or amended by a less-than-ninety-five percent stockholder vote unless the "Continuing Directors," by a unanimous vote, recommended the repeal or amendment to the stockholders.

The language governing the repeal of that supermajority vote provision reads as follows:

> No amendment to the Restated Certificate of Incorporation of the Corporation shall amend, alter, change or repeal any of the provisions of this Article Tenth, unless the amendment effecting such amendment, alteration, change or repeal shall receive the affirmative vote of the holders of at least ninety-five percent (95%) of the outstanding shares of capital stock of the Corporation entitled to vote in elections of directors, considered for the purposes of this Article Tenth as one class; provided that this paragraph 5 shall not apply to, and such ninety-five percent (95%) vote or consent shall not be required for, any amendment, alteration, change or repeal unanimously recommended to the stockholders by the Board of Directors of the Corporation if all of such directors are persons who would be eligible to serve as "Continuing Directors" within the meaning of paragraph (3) of this Article Tenth.

The Court of Chancery observed that the Technicolor charter's only express criterion for the qualification of directors to participate in the required unanimous board action was that they be persons who would be eligible to serve as "Continuing Directors." Paragraph 3 of Article Tenth defined the term "Continuing Directors" as follows:

> The term "Continuing Director" shall mean a person who was a member of the Board of Directors of the Corporation elected by the stockholders prior to the time that [the merger partner] acquired in excess of ten percent (10%) of the stock of the Corporation entitled to vote in the election of directors, or a person recommended to succeed a Continuing Director by a majority of Continuing Directors then serving on the Board of Directors.

The Court of Chancery concluded that the unanimity provision in the Technicolor charter should not be construed to include an implied exclusion of interested directors from eligibility to participate in the unanimous vote. In reaching that conclusion, it relied upon this Court's decision in *Berlin v. Emerald Partners*, Del.Supr., 552 A.2d 482, 488 (1989). *See also Hibbert v. Hollywood Park, Inc.*, Del.Supr., 457 A.2d 339, 343 (1983). The Court of Chancery held:

> Plainly a literal interpretation of the unanimity requirement shows that it was satisfied in this instance. No director voting at the October 1981 meeting had been elected after MAF "acquired in excess of ten percent (10%) of the stock of the Corporation." Provisions in a corporate charter should receive a literal and technical interpretation in most instances. They are customarily drafted by experts who count on them being respected in a precise and literal way. The issue to which the Supreme Court directs our attention—whether one who meets the technical requirement of a continuing director should nevertheless be regarded as a "non-continuing director" because he has a (disclosed) conflicting interest in the transaction, is fully answered I believe by the requirement that, absent fraud or mutual mistake, courts respect and enforce the literal language of the constitutional documents of a corporation.

*Cinerama*, 663 A.2d at 1154–1155 (footnote omitted). We find the Court of Chancery's reasoning to be persuasive and affirm its determination of the first question remanded concerning the Technicolor charter.

The proper resolutions of the other two questions this Court raised regarding the Technicolor charter have been suggested in this opinion already. The second question, whether the provisions of Section 144 override the Technicolor charter requirement of unanimity, has been answered by the conclusion on remand that the unanimous director vote complied with the Technicolor charter. As to the third question, having approved the Court of Chancery's materiality formulation on remand, this Court concludes that full

disclosure of a director's self-interest to an otherwise disinterested and independent board would also satisfy the Technicolor charter's unanimity requirement, *i.e.*, a unanimous vote of the qualified "disinterested and independent" directors. In this case, Sullivan's interest, the only one found to exist, was disclosed to such a board of directors. *Compare* 8 *Del.C.* § 144(a)(1).

## ENTIRE FAIRNESS STANDARD APPLICATION ON REMAND

This Court will now review the entire fairness analysis by the Court of Chancery on remand. The Court of Chancery applied the unified approach to entire fairness mandated by established Delaware law. *Kahn v. Lynch Communication Systems, Inc.,* Del. Supr., 638 A.2d 1110, 1115 (1994); *Cede I,* 542 A.2d at 1187; *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 937 (1985); *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 711 (1983). The Court of Chancery also was cognizant that an entire fairness analysis required it to consider carefully how the *board* of directors discharged all of its fiduciary duties with regard to each aspect of the non-bifurcated components of entire fairness: fair dealing and fair price.

### Part One—Fair Dealing Analysis

#### Timing of Transaction

The fair dealing aspect of entire fairness embraces the question "of when the transaction was timed." *Weinberger v. UOP, Inc.,* 457 A.2d at 711. Cinerama has raised no unfair timing issues in its opening brief in this appeal. *See* Supr.Ct.R. 14. It has, therefore, waived its right to contest that issue on appeal, even if the issue was otherwise previously preserved in the Court of Chancery. *Murphy v. State,* Del.Supr., 632 A.2d 1150, 1152 (1993). In any event, the record reflects that the case *sub judice* is not similar to one in which a fiduciary manipulated the timing of a transaction to benefit itself at the stockholder's expense. *See Jedwab v. MGM Grand Hotels, Inc.,* Del.Ch., 509 A.2d 584, 599 (1986).

#### Initiation of Transaction

■ The fair dealing aspect of entire fairness also "embraces questions of . . . how

[the transaction] was initiated." *Weinberger v. UOP, Inc.,* 457 A.2d at 711. The Court of Chancery found that Technicolor was well-equipped to defend itself against any hostile effort to gain control over it. The record reflects that Perelman "recognized that any deal he might pursue would have to be on friendly terms." *Cf. id.* Consequently, the Court of Chancery determined that MAF was an independent third party with no power to force the initiation of a deal. Accordingly, the Court of Chancery concluded there was no basis for a finding that the MAF transaction was unfairly initiated.

### Negotiation of Transaction

■ This Court has held that arm's-length negotiation provides "strong evidence that the transaction meets the test of fairness." *Weinberger v. UOP. Inc.,* 457 A.2d at 709–10 n. 7; *see also Rosenblatt v. Getty Oil Co.,* 493 A.2d at 937–38. The Court of Chancery's finding that the MAF transaction was the result of "true, arm's-length negotiation," was undisturbed on appeal in *Cede II.* That finding is the law of the case.

The Court of Chancery focused on "the evidence . . . relating to the course of negotiations." It noted that the Technicolor negotiators had effectively bargained with MAF to raise its offer price from an initial $15 per share to $23 per share. Furthermore, the Court of Chancery found that:

> [W]hile the board's failure to adequately canvass the market may arguably be consistent with the idea that they were committed, out of self-interest, to the transaction with Perelman, I do not make this inference. First of all it makes no economic sense given the stockholdings of Mr. Kamerman and Bjorkman. Moreover, the board made this decision on the advice of experienced corporate counsel. They thought they had negotiated a good transaction for the shareholders, and did not want to take steps which might jeopardize it. No improper motive, insofar as the evidence suggests, underlay this decision. In my opinion, the record strongly supports a finding that the directors were motivated by the best interests of the

shareholders in negotiating the transaction with MAF.

*Cinerama,* 663 A.2d at 1150 (footnotes omitted). The Court of Chancery concluded "there is no cogent evidence that the Technicolor Board, in any material respect, put their interests ahead of the shareholders in negotiating the sale of the company." *Id.* at 1149.

The "board approval" aspect of the Court of Chancery's entire fairness analysis, discussed hereafter, also took into consideration that the MAF transaction was not one that involved a board of directors that was dominated by a majority with a financial interest in the transaction, nor a majority with interests in conflict with the corporation's shareholders, nor dominated nor manipulated by a person with such interests.[26] The independence of the bargaining parties is a well-recognized touchstone of fair dealing. *See Kahn v. Lynch Communication Systems, Inc.,* Del.Supr., 638 A.2d 1110 (1994). Accordingly, the Court of Chancery's finding that the Technicolor stockholders had the benefit of an independent and disinterested board is particularly probative evidence with respect to the "negotiation" of the MAF transaction as one aspect of the fair dealing component of entire fairness. *Id.; see Citron v. E.I. Du Pont de Nemours & Co.,* Del.Ch., 584 A.2d 490, 504 (1990).

### Structure of Transaction

 The Court of Chancery carefully examined the structure of the transaction. Cinerama argues that the MAF transaction was unfairly structured because it "unquestionably 'inhibited ... alternative bids'." It contends that the transaction was locked up, included a no-shop provision, and gave Technicolor no "out," *i.e.,* no right to terminate.

Cinerama's contention that the merger agreement left Technicolor with "no out" is contradicted by the testimony of Technicolor's special legal counsel:

> As negotiated out, either the purchaser or Technicolor could terminate if [the merger] hadn't happened by March 31, 1983. And the effect of that was that if MacAndrews wasn't able to complete the acquisition for whatever reason, either its own inability or because a better offer had come along so no shareholders tendered into the MacAndrews offer, then all restrictions on Technicolor would be off if Technicolor terminated the merger agreement because MacAndrews didn't complete it by March 31, 1983.

Technicolor's negotiation of these structural concessions demonstrates that the directors did not seek to foreclose competing bids. Cinerama's assertion that the merger agreement included a "no-shop" clause that "inhibit[ed] [the] board's 'ability to negotiate with other potential bidders'" is not supported by the record. Although it is true that Technicolor could not "shop" for competing bids, it successfully preserved its right to provide information to, and engage in discussions with, competing bidders.[27]

The Court of Chancery concluded on remand that the MAF transaction was not "locked up" by any device except its very high price.

> [W]hile I did conclude that the deal was "probably locked up," if the value of the company at that time was or appeared to be *remotely* close to the value Cinerama claimed at trial, any "lock-up" arrangement present would not have created an insuperable financial or legal obstacle to an alternative buyer. Indeed the conclusion that the transaction was probably locked

---

**26.** The Court of Chancery noted that "Sullivan, the only director with a found, material conflict, fully disclosed that interest to the disinterested members of the board and the contract was thereafter approved by them." *Cinerama,* 663 A.2d at 1141.

**27.** Technicolor's legal counsel testified at trial that:

> The draft served up by counsel for MacAndrews had a prohibition not only against Tech-

nicolor approving or recommending or soliciting any competing proposal but also against Technicolor engaging in discussions with anyone else or furnishing information to anyone else. Those last two points were negotiated out. We said that if another proposal comes along at a better price, even if we can't solicit such a proposal, we should be free to negotiate—excuse me. We should be free to furnish information and engage in rather than solicit discussions with another prospective purchaser.

up was logically and actually premised upon the belief that the $23 price was high. *Cinerama*, 663 A.2d at 1140–41. The Court of Chancery's conclusion is supported by several scenarios subsequently reported in this Court's jurisprudence regarding contests for corporate control. *See, e.g., Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 39 (1994) (QVC made a competing bid, supported by a successful injunctive suit, despite Viacom/Paramount "no-shop" clause, a $100 million termination fee, and an option agreement); *Paramount Communications, Inc. v. Time, Inc.*, Del. Supr., 571 A.2d 1140, 1146–47 (1990) (share exchange agreement, "dry up" agreement and no-shop clause did not prevent Paramount's hostile bid).

### Disclosure to Directors

 Cinerama contends that the non-disclosure to the *directors* of the Sullivan fee's origination at Bear Stearns (MAF's investment banker) and Sullivan's meetings with Perelman constituted a breach of fiduciary duty. When it considered the non-disclosure of those same two matters to the shareholders, the Court of Chancery found: first, that the original source of Sullivan's fee was immaterial under the standard this Court articulated in *Rosenblatt v. Getty Oil Co.*, Del. Supr., 493 A.2d 929 (1985); and, second, that the record did not support Cinerama's contention that Sullivan was Perelman's "inside man." These rulings were affirmed in *Cede II.* They are now the law of the case.

On remand, the Court of Chancery concluded that if those facts did not require disclosure to the stockholders under *Rosenblatt*, they should not be deemed material under an analogy to Section 144(a)(1) either. The Court of Chancery reiterated that the *material* facts regarding Sullivan's interest (the fee's existence and contingency on the MAF deal) were "disclosed and a majority of the non-interested directors approved the transaction in good faith." *Cinerama*, 663 A.2d at 1154. We agree. The duty of disclo-

sure is based on a materiality standard. *See Stroud v. Grace*, Del.Supr., 606 A.2d 75, 84 (1992).

With respect to Ryan's assumed interest, which was not disclosed, the Court of Chancery held that "it is clear under the language of the statute, that the alleged hope of better employment opportunities does not constitute the kind of interest covered by Section 144." *Cinerama*, 663 A.2d at 1154. In other words, Ryan's inchoate hope of improved job circumstances was not the type of self-dealing transaction contemplated by Section 144. We agree. Just as Ryan's undisclosed assumed interest was not "material" under an analogy to Section 144(a)(2), it was not material under an analogy to Section 144(a)(1). *See Cede II*, 636 A.2d at 956; *Stroud v. Grace*, 606 A.2d at 84; *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 890 (1985).

### Approval By Directors

 The Court of Chancery properly took into consideration its previous factual finding that "the predominant majority of the board was, in approving the MAF proposal, motivated in good faith to achieve a transaction that was the best available transaction for the benefit of the Technicolor shareholders." *Cinerama*, 663 A.2d at 1138. That finding was not contested in the prior appeal. *Cede II*, 634 A.2d at 359. It is now the law of the case.

The Court of Chancery acknowledged that the Technicolor board relied heavily upon the advice of Kamerman, the CEO. The Court of Chancery also recognized that the directors "may not blindly rely upon a strong CEO without risk." *Cinerama*, 663 A.2d at 1141.[28] It then noted that the board of directors also relied upon reports by Goldman Sachs and Debevoise & Plimpton, two firms the Court of Chancery described as highly regarded in the financial community.

---

**28.** In a footnote, in support of that proposition, the Court of Chancery cited *Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34 (1994); *Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261

(1989); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986); *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985).

In addition, the Court of Chancery found "the Technicolor board's reliance upon experienced counsel to evidence good faith and the overall fairness of the process." *Id.* at 1142.

> [T]he directors were placed in a position at the October 29 board meeting in which highly competent, indeed, expert legal counsel advised them that they could exercise a good faith business judgment. The testimony of that attorney is clear and I accepted his honesty as a witness completely.

*Id.* at 1141. The Court of Chancery ultimately found the fact that "[t]he directors were acting, and their advisors were guiding them, according to the duties known to them in 1982" was a "relevant but not dominant consideration" in determining fairness. *Id.* at 1141. We agree that the Court of Chancery could properly consider the Technicolor directors' reliance on special legal counsel as a factor supporting fair dealing in an entire fairness analysis.[29]

■ According to the Court of Chancery, it also weighed "the process of board consideration and approval ..." in determining entire fairness. The degree of procedural due care a board of directors exercises has been recognized as a continuing component of an entire fairness analysis. *See Rosenblatt v. Getty Oil Co.*, 493 A.2d at 939. Even after evidence of a breach of the duty of due care has rebutted the procedural presumption of the business judgment rule, the degree of care that the board actually exercised remains relevant, not because it entitles the board's decision to *deference*, but rather because, in determining the directors' liability if the substantive entire fairness standard is not satisfied, the Court of Chancery must identify the deficiency in the board's "actual conduct" in discharging one or more of its fiduciary duties. *Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261, 1280 (1989); *see also Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985).

The Court of Chancery properly considered that the Technicolor board's now undisputed lack of care in making a market check was a flaw in its approval process.[30] However, the Court of Chancery also considered that the Technicolor board: had carefully focused on whether the MAF bid offered the best price available in a sale of the company; had considered whether to shop the company and the risks that course would entail; possessed a substantial amount of prior knowledge pertinent to the decision to sell; and relied on the reports of Kamerman, Goldman Sachs and its outside legal counsel. Under these circumstances, in light of the board's good faith and the arm's-length negotiations, the Court of Chancery determined the decision to approve the MAF proposal without making a market check, while clearly deficient, did not preclude a finding of entire fairness. *Cinerama*, 663 A.2d at 1144–45; *see also Barkan v. Amsted Indus., Inc.*, Del. Supr., 567 A.2d 1279, 1287 (1989);[31] *accord Shamrock Holdings, Inc. v. Polaroid Corp.*, Del.Ch. 559 A.2d 257, 271 (1989).

In its initial personal liability decision, the Court of Chancery found, after trial, that the majority of Technicolor directors were motivated in the transaction, appropriately, to promote the best interests of the shareholders. On remand, the Court of Chancery again concluded "that neither the board nor its deliberations were dominated or manipulated by a person with a material conflicting interest or otherwise lacked independence."

---

**29.** In the absence of a finding of liability, this Court, like the Court of Chancery, need not express an opinion regarding the merit of the defendants' reliance on 8 *Del.C.* § 141(e), as amended in 1987, as an affirmative defense.

**30.** Although the flaw in this proceeding was the failure to make a market check, there is "no single blueprint" under Delaware law that a board of directors must follow to fulfill its obligation to seek the best value reasonably available to the stockholders. *Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637

A.2d 34, 44 (1994) (quoting *Barkan v. Amsted Indus., Inc.*, Del.Supr., 567 A.2d 1279, 1286–87 (1989)).

**31.** In *Barkan*, an appeal from a Court of Chancery approval of a settlement, this Court noted that the board of directors might accept a single offer without a canvass of the market, if it has a reliable "body of evidence with which to evaluate the fairness of the transaction." *Barkan v. Amsted Indus., Inc.*, 567 A.2d at 1287.

*Cinerama,* 663 A.2d at 1139. The Court of Chancery found: the record contained "no persuasive evidence that any of the directors were, in fact, materially influenced in their negotiations by any self-interest they may have had," *id.* at 1149; only one director, Sullivan, had a material conflict; and, no director dominated the process. The Court of Chancery concluded that the record reflected that the Technicolor *board*'s approval was untainted by conflicts. *Cf. In re Tri–Star Pictures, Inc. Litig.,* Del.Supr., 634 A.2d 319 (1993); *Rales v. Blasband,* Del.Supr., 634 A.2d 927 (1993).

**Disclosure to Shareholders**

 Another well-recognized aspect of fair dealing is the board of directors' duty of disclosure to the shareholders. *Weinberger v. UOP, Inc.,* 457 A.2d at 711. In its original post-trial personal liability opinion, the Court of Chancery concluded there was no merit in any of Cinerama's disclosure claims. With one variation, this Court affirmed that ruling. *Cede II,* 636 A.2d at 956–57.

The variation was that this Court, while affirming the ruling that Ryan's undisclosed and "assumed" interest was not material for disclosure purposes pursuant to the holding in *Rosenblatt,* directed the Court of Chancery to consider Ryan's assumed interest "in the context of Technicolor's charter requirement of director unanimity." *Id.* As to that limited disclosure issue, the Court of Chancery held on remand that the unanimity requirement in Technicolor's charter was unaffected by director interest in the absence of "fraud or mutual mistake." *Cinerama,* 663 A.2d at 1155. Thus, it concluded that no disclosure violation could be based on Sullivan's disclosed interest, and that Ryan's undisclosed but assumed interest was immaterial.

The Court of Chancery's conclusion that the directors had complied with the disclosure duty is not, in and of itself, determinative of entire fairness, but it does have persuasive *substantive* significance. *See Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1104–05 (1985). First, it removes this case from the "virtual *per se* rule

of damages for breach of the fiduciary duty of disclosure" this Court recognized in *In re Tri–Star Pictures, Inc. Litig.,* Del.Supr., 634 A.2d 319, 333 (1993). Second, it bears directly upon "how the approval of the . . . stockholders [was] obtained." *Weinberger v. UOP, Inc.,* 457 A.2d at 711. Third, it places this case into the category of a "non-fraudulent transaction," wherein this Court recognizes "that price may be the preponderant consideration outweighing other features of the merger." *Id.*

**Approval by Shareholders**

 The record reflects that "more than seventy-five percent of [Technicolor's] shares were tendered in the transaction" to MAF. Cinerama was the *only* stockholder to pursue appraisal rights. Generally, "where a majority of fully informed stockholders ratify action of even interested directors, an attack on the ratified transaction normally must fail." *See Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 890 (1985). Accordingly, in the absence of a disclosure violation, the Court of Chancery properly found the tender by an overwhelming majority of Technicolor's stockholders to be tacit approval and, therefore, constituted substantial evidence of fairness. *Cf. id.* at 889–90; *Tanzer v. Int'l Gen. Indus. Inc.,* Del.Ch., 402 A.2d 382, 395 (1979).

**Part Two—Fair Price Analysis**

 In addition to fair dealing, the other major component of the non-bifurcated entire fairness standard is fair price. The Court of Chancery found "[n]umerous reliable sources [that] indicate that the $23 per share received constituted the highest value reasonably available to the Technicolor shareholders." *Cinerama,* 663 A.2d at 1142. First, MAF paid a 109% "one-month deal premium" over the market price. This constituted the fourth highest premium paid over market price in transactions involving comparably sized companies, according to the "Alcar Comparable Deal Analysis" performed by the defendants' primary valuation expert. In fact, with regard to sixty-one other transactions, that analysis demonstrated that the price MAF paid was more than double the average fifty-one percent premium paid over

market price and represented a premium of 116% relative to Technicolor's market price one month prior to the MAF tender offer. Within Technicolor's industry specifically, the premium over market price MAF paid was the highest for an acquisition in the 1981–84 period, and four times the average premium (26.55%). Second, Technicolor's senior management accepted MAF's bid and declined to pursue a competing buy-out. Third, the Court of Chancery found the "fact that major shareholders, including Kamerman and Bjorkman who had the greatest insight into the value of the company, sold their stock to MAF at the same price paid to the remaining shareholders also powerfully implies that the price received was fair." *Id.*, at 1143. If Technicolor was worth more than $62 per share, as Cinerama contends, Kamerman (with 128,874 shares) and Bjorkman (with 409,406 shares) would have lost more than $5 million and $16 million respectively by tendering their shares to MAF for $23 per share. Fourth, "experts in the marketplace," including Goldman Sachs, indicated "explicitly and implicitly" that the price was fair. *Id.*[32] Fifth, the Court of Chancery noted in its original liability opinion that there was no persuasive evidence that Technicolor's "private market" or public sale value was greater than $23 per share. *Id.*, at 1143–44. Similarly, on remand, the Court of Chancery again noted that Cinerama "offered meager [rebuttal] evidence to support a finding that $23 per share constituted an unfair price."

Cinerama argues that if Technicolor had been "shopped," a "cash-rich" purchaser would have come forward and offered a higher price. The Court of Chancery concluded, however, that Cinerama had offered no credible evidence to support that proposition *in rebuttal* to Technicolor's "fair price" evidence. *Accord Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985). Cinerama's only direct evidence relating to price fairness

came through its valuation expert, John Torkelsen, whose methodology and conclusions the Court of Chancery found to be "troubling" and "too strikingly odd" to be accepted. *Cinerama*, 663 A.2d at 1144.

This Court has observed that "when it is widely known that some change in control is in the offing and no rival bidders are forthcoming over an extended period of time, that fact is supportive of the board's decision to proceed." *Barkan v. Amsted Indus., Inc.,* Del.Supr., 567 A.2d 1279, 1287 (1989). In *Barkan*, this Court also noted that various other apparent obstacles have not prevented "rival bidders from expressing their interest in acquiring a corporation." *Id.; see also Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34 (1994); *Paramount Communications, Inc. v. Time, Inc.,* Del.Supr., 571 A.2d 1140 (1990). In this case, the record reflects that no rival bidder came forward even though the MAF transaction did not close for several months after it was announced. *See Cede II,* 634 A.2d at 357–58.

The Court of Chancery concluded that the $23 per share offer "was the highest value reasonably achievable." *Cinerama,* 663 A.2d at 1144 (citing *Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34 (1994)). Substantial record evidence supports the Court of Chancery's finding that the $23 deal price was the highest price reasonably available. That conclusion is the result of an orderly and logical deductive process.

**Part Three—Entire Fairness Determination**

Over the course of forty-seven days, the Court of Chancery heard more than forty-one days of live testimony, including twenty-

---

**32.** The Court of Chancery found that Goldman Sachs "opined that the price was fair after performing a number of different analyses, all of which are acceptable valuation bases. Goldman did conclude that a marginally higher price might be arranged for an MBO but even if one assumes that to be the case and infers from that that some buyer other than Perelman or manage-

ment might have been able to pay such a price, such an inference would be supportive of the conclusion that $23 per share was an entirely fair price." *Cinerama,* 663 A.2d at 1143. Goldman Sachs made an oral presentation based upon a 78–page "board book." *Cede II,* 634 A.2d at 357.

six days of expert testimony.[33] It was ultimately called upon to assess the demeanor and credibility of twenty-two witnesses, four of whom were director defendants. According to the Court of Chancery, its entire fairness determination was based, in part, on its conclusions that:

(1) CEO Kamerman consistently sought the highest price that Perelman would pay; (2) Kamerman was better informed about the strengths and weaknesses of Technicolor as a business than anyone else; he was an active and experienced CEO who had designed and implemented a cost reduction program that was very beneficial and knew the businesses in which Technicolor operated; (3) Kamerman and later the board were advised by firms who were among the best in the country; (4) the negotiations lead to a price that was very high when compared to the prior market price of the stock (about a 100% premium over unaffected market price) or when compared to premiums paid in more or less comparable transactions during the period; (5) while the company was not shopped, there is no indication in the record that more money was possible from Mr. Perelman or likely from anyone else; management declined to do an MBO transaction at a higher price and while I did conclude that the deal was "probably locked up," if the value of the company at that time was or appeared to be *remotely* close to the value Cinerama claimed at trial, any "lock-up" arrangement present would not have created an insuperable financial or legal obstacle to an alternative buyer. Indeed the conclusion that the transaction was probably locked up was logically and actually premised upon the belief that the $23 price was high.

*Cinerama*, 663 A.2d at 1140–41. After considering all of the "admissible credible evidence," following a lengthy trial and this Court's remand, the Court of Chancery con-

cluded that the defendants had met their burden of establishing entire fairness:

I, of course, desire to accord complete respect to the Supreme Court's conclusion that the director defendants were negligent and insufficiently informed when they resolved to accept the MAF proposal. And I recognize the force of the claim that a process that is uninformed can never be fair to shareholders. Yet *recognizing that a single judgment concerning all factors is called for* I find myself unable to conclude that the MAF tender offer/merger was not a completely fair transaction.

*Id.* at 1140 (emphasis added).

[W]hile I conclude that the process followed by the board in authorizing the corporation to enter into the MAF transaction was flawed in that, as found by the Supreme Court, the board was insufficiently informed to make a judgment worthy of [procedural] presumptive deference, nevertheless considering the whole course of events, including the process that was followed, the price that was achieved and the honest motivation of the board to achieve the most financially beneficial transaction available, I conclude that the defendants have introduced sufficient evidence to support a conclusion that, and I do conclude that, the merger in which plaintiff was cashed out, as well as the tender offer in which MAF acquired the stock interest that enabled MAF to cash out plaintiff were [substantively entirely] fair transactions in all respects to Cinerama.

*Id.* at 1143–44.

## STANDARD OF REVIEW
## ENTIRE FAIRNESS DETERMINATION

The standard and scope of appellate review of the Court of Chancery's factual findings following a post-trial application of the entire fairness standard to a challenged merger is governed by *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972). *See Rosenblatt v. Getty*

---

**33.** This may have been the longest trial in the illustrious two hundred and three year history of the Delaware Court of Chancery. *See* Maurice A. Hartnett, *The History of the Delaware Court of Chancery*, 48 Bus.Law. 367 (1992); William T.

Quillen & Michael Hanrahan, *A Short History of the Delaware Court of Chancery*, in *Court of Chancery of the State of Delaware 1792–1992* (Historical Society for the Court of Chancery ed., 1992).

*Oil Co.,* 493 A.2d at 937. In *Levitt,* this Court stated:

> In exercising our power of review, we have the duty to review the sufficiency of the evidence and to test the propriety of the findings below. We do not, however, ignore the findings made by the trial judge. If they are sufficiently supported by the record and are the product of an orderly and logical deductive process, in the exercise of judicial restraint we accept them, even though independently we might have reached opposite conclusions. It is only when the findings below are clearly wrong and the doing of justice requires their overturn that we are free to make contradictory findings of fact. When the determination of facts turns on a question of credibility and the acceptance or rejection of "live" testimony by the trial judge, his findings will be approved upon review. If there is sufficient evidence to support the findings of the trial judge, this Court, in the exercise of judicial restraint, must affirm.

*Levitt v. Bouvier,* 287 A.2d at 673 (citations omitted).

 Accordingly, this Court will not ignore the findings of the Court of Chancery if they are sufficiently supported by the record and are the product of an orderly and logical deductive process. *Id.* In addition, this Court accords "a high level of deference" to Court of Chancery findings based on the evaluation of expert financial testimony. *Kahn v. Household Acquisition Corp.,* Del. Supr., 591 A.2d 166, 175 (1991).

### THIS APPEAL
### ENTIRE FAIRNESS AFFIRMED
### PRINCIPLED BALANCING ANALYSIS

In *Cede II,* this Court emphasized that the entire fairness standard is exacting and requires the board of directors to "establish to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cede II,* 634 A.2d at 361. On remand, the Court of Chancery re-evaluated the full record regarding the Technicolor board's conduct, in view of this Court's ruling that the directors were grossly negligent in failing to provide for a market test. In its entire fairness analysis, the Court of Chan-

cery weighed that omission in the board process against its other findings of fact concerning the board's proper conduct. The Court of Chancery found itself "unable to conclude that the MAF tender offer/merger was not a completely fair transaction." *Cinerama,* 663 A.2d at 1178.

 A finding of perfection is not a *sine qua non* in an entire fairness analysis. That is because the entire fairness standard is not even applied unless the presumption of the business judgment rule has been rebutted by evidence that the "directors ... breached any *one* of the *triads* of their fiduciary duty—good faith, loyalty, or due care." *Cede II,* 634 A.2d at 361. Thus, "perfection is not possible, or expected" as a condition precedent to a judicial determination of entire fairness. *Weinberger v. UOP, Inc.,* Del. Supr., 457 A.2d 701, 709 n. 7 (1983).

The standard of entire fairness is also not in the nature of a litmus test that "lend[s] itself to bright line precision or rigid doctrine." *Nixon v. Blackwell,* Del.Supr., 626 A.2d 1366, 1381 (1993). Conversely, in *Nixon,* this Court also stated that entire fairness cannot be ascertained by an unstructured or visceral process. *Id.* at 1378. Rather, it is a standard by which the Court of Chancery must carefully analyze the factual circumstances, apply a disciplined balancing test to its findings, and articulate the bases upon which it decides the ultimate question of entire fairness. *Id.* at 1373, 1378; *accord Kahn v. Lynch Communication Systems, Inc.,* Del.Supr., 638 A.2d 1110, 1120 (1994).

 The record reflects that the Court of Chancery applied a "disciplined balancing test," taking into account all relevant factors. *See Nixon v. Blackwell,* 626 A.2d at 1373. The Court of Chancery meticulously considered and weighed each aspect of fair dealing and fair price that the Technicolor board had properly discharged, in accordance with its fiduciary duties, against the Technicolor board's failure to test the market. After finding that the price obtained was the highest price reasonably available, the Court of Chancery concluded that the MAF transaction was entirely fair. *Accord Shamrock Holdings, Inc. v. Polaroid Corp.,* Del.Ch., 559 A.2d 257, 275 (1989).

That entire fairness determination, incorporating questions of credibility and based on more than forty-one days of live testimony and extensive expert witness presentations, must be accorded substantial deference on appellate review. *Rosenblatt v. Getty Oil Co.*, 493 A.2d at 937. The record supports the Court of Chancery's entire fairness determination. *Id.* The Court of Chancery's determination is also the product of an orderly and logical deductive process. *Id.* Accordingly, this Court affirms the Court of Chancery's holding that the MAF transaction was entirely fair to the Technicolor shareholders.

## CONCLUSION

On remand, the Court of Chancery properly addressed each of the issues identified by this Court in its mandate. The judgment of the Court of Chancery, in favor of the defendants, is AFFIRMED.[34]

---

**34.** Even though this litigation was protracted, it had none of the attributes of *Jarndyce and Jarndyce*, a case depicted and criticized by Charles Dickens in *Bleak House.* Charles Dickens, *Bleak House* (Norman Page ed., Penguin Books 1971) (1853). The presentations by the attorneys for all parties were paragons of professional advocacy from the inception of this proceeding through its conclusion with this appeal. The exemplary manner in which this litigation proceeded through the Court of Chancery demonstrates why that institution is held in such high regard. *See* William H. Rehnquist, *The Prominence of the Delaware Court of Chancery in the State–Federal Joint Venture of Providing Justice*, 48 Bus.Law. 351 (1992); E. Norman Veasey, *The National Court of Excellence*, 48 Bus.Law. 357 (1992).