Justice NEWBY dissenting.
**169 The majority's message to the business community is clear: Individuals serve as outside directors at their own peril! If a director makes an alleged misstatement to a potential investor, no matter how minute and regardless of whether the investor relied on it, the director may be personally liable. Today's decision eviscerates any protection for an outside director who uses information communicated by corporate officers to tell others of potential investment opportunities. In fact, the majority ratifies the outside director's *500 liability, even though the corporate officers who made later-in-time statements were exonerated. While the majority's lengthy technical analysis may cloud its assault on fundamental business relationships, its ultimate result will decrease the number of people willing to serve as outside directors and severely limit start-up companies' access to angel investor capital.
Essentially, the majority holds that an outside director can be liable to an angel investor for repeating information he learned from corporate officers (1) even though the angel investor vetted the information through subsequent conversations with the corporate officers, and (2) the officers were absolved from liability for communicating the same information. Liability arises even though the investor does not rely on the alleged misstatement. To achieve this outcome, the majority withholds the director safe harbor protection that should be available to an outside director. The majority wrongly expands potential liability under the securities fraud statute while shrinking any protection under the director safe harbor provision. In doing so, the majority exposes outside directors who identify potential investors, even those who are astute and experienced angel investors, to potential liability as "sellers" for purposes of the securities fraud statute. The liability extends here even though the outside director does not personally benefit directly from the sale, receiving neither funds from a direct sale of an interest nor a commission. Such an expansive reading could expose to liability anyone who discusses a potential investment opportunity with a friend. The majority wrongly holds that the securities fraud statute supplants director safe harbor protection. The majority's unwarranted analysis will have significant chilling effects in the business community.
Furthermore, the verdicts in this case are a miscarriage of justice because of their inconsistency regarding Rice, the Chief Executive Officer and director, and Brannon, the outside director. Brannon's representations to plaintiffs were not "materially" different from those of Rice. The majority's analysis diminishes the required "materiality" of an alleged misrepresentation to, in effect, any misrepresentation, no matter **170 how "nuanced." The majority ignores the plain fact that, as experienced angel investors, plaintiffs thoroughly discussed the Verizon potential with the only person actually present at the meeting, Cummings, the director of sales. The evidence is uncontroverted that plaintiffs did not invest after communicating with Brannon but only after multiple conversations with Cummings as well as Rice and Kirkbride, another corporate officer. Through these conversations, plaintiffs clarified the "true" nature of the Verizon opportunity. If Rice's statements to plaintiffs were accurate, then plaintiffs knew the "truth" about the opportunity before investing. Because of the dangerous removal of the director safe harbor protection and the miscarriage of justice arising from the inconsistent verdicts, I dissent.
I. Relevant Facts
In 2007 defendants Rice and Kirkbride founded a technology start-up, Neogence, to develop graphical software, which could be loaded onto smartphones. Rice (the Chief Executive Officer and a director) and Kirkbride (an investor, director, the de facto Chief Financial Officer, a licensed attorney, and later the Chief Executive Officer) served as the initial board members. In 2009, as the corporation grew, Rice invited Brannon, an OB-GYN physician and investor, to join the Neogence board as an outside director.[1] Brannon had originally met Rice years before, and they had worked together on a prior venture. Kirkbride stated that Brannon was asked to serve on the board because of, inter alia , his "abilities on strategic directions," including obtaining "financing, investors, et cetera." Rice stated that Brannon "would make introductions to people that might have an interest in what [Neogence was] doing." As Brannon characterized it, as a director he would "expos[e] this company to friends that may want to invest into it."
During Neogence's initial months as a start-up corporation, the board met informally and often. The company had elected to raise operating capital by issuing promissory *501 notes, which were convertible to common stock. Neogence engaged legal counsel to draft the convertible notes and related documentation. Neogence, acting through its board of directors, then approached various "accredited" "angel investors"[2] to obtain **171 funding. Each director helped identify and solicit investors throughout the ongoing fund-raising process.
In late 2009 Neogence hired John Cummings as an officer to serve as "director of sales." Cummings had worked for a company in which Brannon had previously invested, and they had become business acquaintances. Cummings's role "was focused on sales and business development."
In early 2010, during the process of raising capital and identifying investors, at Brannon's suggestion Rice reconnected with plaintiff Piazza, a previous investment partner from a prior venture, to discuss Neogence. In February 2010, Piazza loaned Neogence $ 50,000 in exchange for two convertible promissory notes, convertible to Neogence stock at various points in time. Incorporated within the promissory notes executed by Piazza was a note purchase agreement, wherein Piazza represented that, inter alia , he "is an accredited investor," is "able to fend for [himself]," and "has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of [his] investments, and has the ability to bear the economic risks of [his] investments."[3] The purchase agreement and February promissory notes are signed by Rice as CEO of Neogence. Also in February 2010, Brannon introduced plaintiff Lampuri to Rice "as a potential investor."
The critical event, which led to this litigation, occurred on 30 April 2010 when Cummings informally met with a representative from Verizon, a national telecommunications company, and discussed Neogence's software technology and its development status. The meeting took place in New York at the offices of Verizon's marketing agency. The parties "brainstorm[ed]" about the possibility of including the Neogence software as a smartphone application for Verizon's upcoming summer campaign. The Verizon representative indicated that "if [the software] lived up to the things [Cummings] had presented in the meeting," and Neogence was "able to demonstrate it properly and functionally, that [Verizon's marketing agency] would consider [the software] as part of their marketing for" certain smartphones and a "future potential business relationship" with Neogence.
**172 Excited about this prospect, Cummings communicated the "Verizon opportunity" to Neogence board members Rice, Kirkbride, and Brannon, noting that if Neogence could "come back with a demo, ... we would have a lot of possibilities of what we could do with the company and how great that that would be for Neogence. But the priority was to get the [software application] developed."
That same day, Brannon quickly e-mailed several people, including Piazza, copying Rice, stating:
Guys John Cummings just had a meeting in NY with Verizon. We need $ 100K - $ 200K ASAP, [sic] in 3-4 weeks we go back to Verizon we have an oppurtnity [sic] to be their featured [software]. [Rice ] is going to send out a summary later today . I know all of you are BUSY!!! I need you to give a few minutes to look at this potential.
(Emphasis added.) As promised, Rice followed up with the more detailed e-mail that same evening, stating:
Gentlemen, *502 John Cummings met with [the marketing agency] and the director of new technologies at Verizon (I believe that was his title) this afternoon in New York. John can give you more details directly.
John basically laid out our [software] strategy of meeting consumer demand by providing the first social media marketplace that enables people to buy, sell, and trade virtual goods for use in mobile and augmented reality. ...
....
Verizon responded extremely well to this and asked how we differentiate ourselves from others.... [W]e are the first launching a virtual goods marketplace (tapping into one of the newest and fastest growing multi-billion dollar markets).
While we have been seeking $ 200k in additional angel funding to meet our [existing] milestones and deliverables ..., we now have an opportunity to go back to Verizon in about three weeks to blow their minds with a demo that shows everything we are doing.... The opportunity here is to become the featured [ ] application for Verizon , **173 OEM'd on [certain smartphones], and leverage their marketing. Even bigger, if we can pull this off with Verizon, it puts us squarely in the limelight of catching the eyes of other Fortune 100 companies for marketing, promotions, and strategic partnerships.
The challenge here, is that we have to jump to warp speed to accelerate development ... not only to meet our milestones, but to WOW Verizon. This is a one-shot opportunity. As things currently are, we are crawling along to meeting the milestones, but there is no way we can deliver the perfect demo for Verizon without immediate funding.... We need help finding additional angel capital that can make a decision and move quickly.
We need $ 200k.
(Emphases added.) (Internal quotation marks omitted.)
On 1 May 2010, the next day, Piazza spoke by telephone directly with Cummings, inquiring further about the details of his New York meeting and the potential opportunity with Verizon. Cummings clarified that any opportunity with Verizon was merely a possibility and that their "in" was through Verizon's marketing agency. Piazza testified that during that phone conversation,
[Cummings] was very excited that he had just gotten out of a meeting the day before, that he had held-that was held at [Verizon's advertising agency], and he had met a Verizon executive of new technologies. And that-that particular person was intrigued enough to invite him back to Verizon with an app, a demo app, such that, if they liked this we had an amazing opportunity to be on every Verizon Droid phone as a pre-installed application, OEMed, featured AR, I'm not sure.
Brannon was not a part of the call.
Beginning on 3 May, Rice sent a series of e-mails to Kirkbride, Brannon, Cummings, and Piazza specifying the technology development timeline and the need to have additional capital. On 25 May, Rice e-mailed Piazza saying,
I'll do whatever it takes to get you on board. At this point, I can't move this company forward without you.
**174 Without you investing, right now, we are going to lose our momentum, development is going to stall, and we are likely going to lose some people that have to deal with economic realities of their own. If this does happen, I'll keep fighting and rebuild, but we will have lost our chance to be a player in the industry this year.... It will take me months to recover if we fall apart right now.
On the other hand, if you invest now, you are effectively breathing new life back into the company, and empowering me (and us) to stop crawling along and start running the race....
I can do all of this with your investment this week and I can deliver. Granted some of the timelines and milestones have shifted, and will always continue to shift as we move forward....
You know I have been completely open and transparent with you from day one, even to my disadvantage in negotiating, and quite frankly we are at a crossroads *503 right now. We need your investment, and we need it yesterday.
Please believe in me and the team. We can't do this without you.
Afterwards, Rice told Kirkbride to "[d]o what you feel is necessary to close" Piazza.
On 26 May 2010, Cummings and Kirkbride flew to Maine to meet with Piazza and further discuss the "potential of" Neogence and to solicit his "interest in making an investment." Brannon was not present. After visiting with Cummings and Kirkbride and having talked with Rice, on 28 May Piazza loaned an additional $ 150,000 to Neogence in exchange for a convertible promissory note.
While Lampuri had met Rice and learned of Neogence in February 2010, he had not yet become an investor. Brannon told him in person of the potential Verizon opportunity on 25 May 2010. Thereafter, Lampuri met with Cummings who, along with Rice and Kirkbride, later met with Lampuri twice over the summer to discuss his loaning funds to Neogence and the potential for its "technology [to] be used in a number of different ways with a number of different brands," as well as the potential opportunity to present a demo to Verizon through its marketing agency. Lampuri testified that he
**175 was given a presentation that John Cummings was the lead on, and he discussed and reiterated basically what Greg [Brannon] had said, that he was in New York in a meeting with an advertising company, and that there were Verizon executives in the room. And they were, again, absolutely wowed by the technology, that we need-they needed to go back, create a demo, go back to Verizon in a couple weeks and if they-if they wowed Verizon, I like to say, then they have the opportunity to be preloaded, OEMed on all phones.
When specifically asked, "How did what John Cummings told you at that meeting compare with what Dr. Brannon had told you on May 25th 2010 ...," Lampuri replied, "Essentially they were the exact same thing, very similar conversations," and "[b]oth had the same outcome that, you know, they met with a Verizon executive." Lampuri mentioned that in his conversation with Brannon "there was no word of advertising," but it was "essentially the exact same conversation." When asked during direct examination at trial what Rice contributed to discussions at the meeting, Lampuri testified that Rice "said the deal was very much real. It was a real opportunity, and the funds that they were seeking were to get this demo up and doing-up and coming to show Verizon." Lampuri left Cummings's presentations without making an investment.
Neogence missed its anticipated July deadline to demonstrate its software to the marketing agency and Verizon. Cummings rescheduled for "another 30, 60 days," ultimately for the fall of 2010. Again in August 2010, Lampuri met with Rice, Kirkbride, and Cummings at Neogence's headquarters. During those meetings, Lampuri alleges he was told that Neogence was preparing "to follow through on an opportunity Verizon had provided Neogence for Mirascape to become a featured AR application pre-installed on all Verizon DROID smartmobiles." Brannon did not attend any of these meetings.
Nonetheless, on 24 September 2010, well after the initial July deadline and months after his 25 May 2010 conversation with Brannon, and after having spoken with Cummings, Kirkbride, and Rice, Lampuri loaned Neogence $ 100,000 in exchange for a convertible promissory note. In that note purchase agreement, Lampuri, like Piazza, represented that he "is an accredited investor," is "able to fend for [himself]," and "has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of [his] investments, and has the ability to bear the economic risks of [his] investments." The purchase agreement is signed by Kirkbride as CEO of Neogence.
**176 Neogence continued to miss deadlines. That fall, Cummings flew to New York again to meet with Verizon and its advertising agency to present the software technology, but Cummings "had to cancel the meeting while in front of the [office] building because" the software "would not function" on his smartphone. Ultimately, Neogence failed to create a functioning demo of its software.
*504 Neogence went into a decline and was "having a very difficult time raising funds." Nonetheless, plaintiffs, as well as Brannon, invested additional money in Neogence in 2011, well after any opportunity with Verizon had passed. By the summer of 2011, Neogence was past due on its rent. On 7 July 2011, counsel for Piazza sent a formal demand letter seeking repayment of Piazza's promissory notes, which had matured and were past due. Shortly thereafter, Neogence closed its doors and went out of business.
On 13 July 2011, plaintiff Piazza filed his complaint against the corporation, Neogence Enterprises, Inc., for breach of contract stemming from Neogence's failure to repay his promissory notes upon their reaching maturity, seeking return of principal plus accrued interest. Piazza obtained a default judgment.
On 10 October 2012, plaintiffs filed their complaint against defendant officers and directors, Kirkbride, Rice, and Brannon, personally, for, inter alia , "securities fraud" under the North Carolina Securities Act, seeking money damages for the selling of a security by means of any untrue statement of a material fact or any omission.[4] These claims were based on alleged misrepresentations made by defendants to plaintiffs arising from the 30 April 2010 meeting between Cummings and Verizon. Specifically, plaintiffs complained
[t]he representations made by Brannon, Rice, and Kirkbride to both Piazza and Lampuri regarding the opportunity for Mirascape to become a featured AR application pre-installed on all Verizon DRIOD smartphones were false and misleading. At no time did any person associated with Verizon ever discuss with John Cummings or any other Neogence officer, director, or employee any opportunity for Mirascape or Neogence technology to become a featured AR application pre-installed on all-or any-Verizon DRIOD smartphones.
**177 Plaintiffs directed their allegations of fraudulent misrepresentation at defendants as a group; plaintiffs did not differentiate regarding the alleged misrepresentations by any individual defendant. Cummings, who was the director of sales, was not a named defendant in the complaint even though he was the only Neogence officer at the 30 April 2010 meeting, had communicated about the meeting with the directors, and had discussed the meeting and the potential opportunity in detail with both plaintiffs before either plaintiff invested in the company.
Despite having spoken directly and at length with Cummings regarding the possible opportunity with Verizon, and despite having invested money in Neogence well after it had lost that opportunity, plaintiffs asserted that they would not have loaned money to Neogence but for defendant directors' "false and misleading" representations, namely that the Neogence software potentially could "become a featured [ ] application pre-installed on all Verizon [ ] smartphones." Plaintiffs stated that "[a]t all relevant times material to this action, Kirkbride, Brannon, and Rice served on Neogence's board of directors."
Brannon unsuccessfully moved to dismiss plaintiffs' claims under Civil Procedure Rule 12(b)(6) based on plaintiffs' representations in their promissory note purchase agreements attesting to their ability to independently evaluate "the merits and risks" of their investments "through simple inquiries" beforehand. Brannon answered that, in his capacity as a director, he was entitled to rely on the statements and representations made to the board by the director of sales, Cummings. Specifically, Brannon answered that "[i]f the Plaintiff Piazza relied upon any misrepresentations made by Neogence directors or officials, he would have relied upon what was told to him by Kirkbride or Cummings on or about May 26, 2010," the date of the Maine solicitation meeting, just two days before Piazza loaned an additional $ 150,000 to Neogence. As to Lampuri's claims, Brannon answered that when he
spoke with Lampuri, he stated, based upon what Cummings reported to the Neogence board members, that Neogence had an opportunity of becoming a featured AR
*505 application with Verizon, but the conversation was broader and [he] also advised Lampuri that a prototype or demo of the software had to be created and a presentation would need to be made to have the chan[ce] to have an "opportunity" fulfilled....
Before trial Kirkbride moved for summary judgment in his favor as a matter of law, arguing
**178 (1) the alleged representations of Kirkbride were true; (2) the statements allegedly made were too contingent and vague to be a material misrepresentation of a past or existing fact or reasonably relied upon; (3) Plaintiffs failed to make the required showing of a reasonable inquiry necessary to show reasonable reliance; and (4) Mr. Kirkbride did nothing but rely on Mr. Cummings in repeating Mr. Cummings' statements.
Likewise, Rice and Brannon moved for summary judgment, similarly arguing that the representations made were "literally true":
1. Plaintiff Piazza was equally or possibly a more sophisticated investor than was either of the Defendants and hence he could not have reasonably relied upon either of them; Plaintiff Lampuri invested long after the "opportunity with Verizon" complained of was an immediate and/or achievable goal and hence his reliance upon either of the Defendants with respect to emails months before his investment is unreasonable as a matter of law.
2. Further, the representations allegedly made by [Cummings, Kirkbride, Brannon, and Rice] were literally true and insufficiently definite to be false or reasonably relied upon as a matter of law.
3. There were no legally material misrepresentations of fact made by either Defendant to the Plaintiffs.
4. Plaintiffs failed to make any reasonable inquiry or perform even minimal due diligence as to the basis or meaning of any alleged representations made to them prior to investing in Neogence.
On 25 November 2013, the trial court found no genuine issue of material fact with regard to plaintiffs' claim of securities fraud against Kirkbride and granted his motion for summary judgment but denied the motions of Rice and Brannon. The trial court did not give a specific reason for granting summary judgment for Kirkbride but denying it for Rice and Brannon. The claims against Rice and Brannon proceeded to trial.
At different stages of trial, Brannon moved to dismiss the claims against him based on an outside director's reliance upon representations of corporate officers (director safe harbor). The trial court denied the motions.
**179 At the charge conference, counsel requested pattern instruction 807.50, noting that "this statute," N.C.G.S. § 55-8-30 and its protections referenced in Brannon's answer, "needs to be inserted" in the jury instructions. The protection, described as the "Director Safe Harbor," states:
(b) In discharging the duties of a director's office, a director is entitled to rely on information , opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by any of the following:
(1) One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented.
N.C.G.S. § 55-8-30(b)(1) (Supp. 2018) (emphases added). Brannon included in his proposed jury instructions North Carolina Pattern Instruction Civil 807.50, titled "Breach of Duty-Corporate Director." The proposed instruction included the following language:
"Was the plaintiff damaged by the failure of the defendant to discharge his duties as a corporate director?"
On this issue the burden of proof is on the plaintiff. This means that the plaintiff must prove, by the greater weight of the evidence ...:
....
... that the defendant failed to act as an ordinarily prudent person in a like position would have acted under similar circumstances. (Unless he has actual knowledge to the contrary, a director is entitled to rely on information, opinions, reports or statements, including financial statements *506 and other financial data, if prepared or presented by
[one or more employees of the corporation who the director reasonably believes to be reliable and competent in the matter(s) presented]
(Footnote call numbers and italics omitted.) The trial court denied the proposed instruction on the basis that the instruction wrongly placed the burden of proof on plaintiffs instead of Brannon, at which time **180 Brannon's counsel suggested attempting to craft a different instruction. Apparently, no special instruction incorporating the director safe harbor protection was ultimately produced. Brannon reasserted his request for the pattern jury instructions regarding director safe harbor, N.C.G.S. § 55-8-30. The trial court denied the request.
The jury received four copies of the following issue to determine whether Rice and Brannon had made any misrepresentations to plaintiffs that would subject these defendants to individual liability under the securities fraud statute, N.C.G.S. § 78A-56(a)(2) :
Did Defendant, [name], in soliciting the Plaintiff, [name], to pay money for a security, make a statement which was materially false or misleading, or which under the circumstances was materially false or misleading because of the omission of other facts, where the Plaintiff, [name], was unaware of the true or omitted facts?
The trial court instructed the jury that, "[o]n this issue, the burden of proof is on the plaintiff." The trial court also instructed the jury to answer: "Did the defendant [Brannon] not know and in the exercise of reasonable care could not have known of the untruth or omission in his offer or sale of a security to the plaintiff [name]. On this issue, the burden of proof is on the defendant [Brannon]."
The jury found Brannon had made representations to both Piazza and Lampuri that were materially false or misleading and that plaintiffs were unaware of the true facts but found that there was either no such misrepresentation on Rice's part or that plaintiffs were aware of the truth.[5] Therefore, logically, the jury determined one of the following: (1) Rice was truthful that Cummings met with a Verizon representative and discussed the "opportunity" for Neogence technology "to become the featured [ ] application for Verizon" smartphones, or (2) plaintiffs knew the meeting did not take place or the "opportunity" did not exist.
Thus Brannon, the outside director without technical expertise, was the only defendant held liable. The jury found Brannon liable even **181 though Rice, Kirkbride, and Cummings met with each plaintiff several times before either invested. The trial court then adjudged that defendant was liable to Piazza for $ 150,000.00 plus prejudgment interest of $ 45,000.00, that Brannon was liable to Lampuri for $ 100,000.00 plus prejudgment interest of $ 27,333.33, and that plaintiffs could recover, jointly and severally, from Brannon $ 123,804.00 in attorneys' fees and $ 8,493.79 in court costs.
Brannon unsuccessfully moved for "judgment notwithstanding the verdict [JNOV] or in the alternative a new trial," arguing, inter alia , that the verdicts as to Rice and himself were inherently inconsistent given that
Plaintiffs' evidence at trial tended to show that Defendant Brannon, an unpaid director, told Plaintiffs orally the same things that Defendant Robert Rice, a paid officer, communicated. The jury, however, found that the communicated information was a misrepresentation when communicated by Defendant Brannon, but was not a misrepresentation when communicated by Defendant Rice.
In the same motion, Brannon unsuccessfully argued that he, as a corporate director, "was entitled to rely on the information he received from John Cummings and repeated to plaintiffs as a matter of law under [the director safe harbor statute]" and that the trial *507 court erred by instructing instead "on the general standard of reasonableness." Given that "[o]ne of the duties of a director is seeking capital investment in the company," Brannon argued he "requested and was entitled to an instruction under N.C.G.S. [§] 55-8-30(b)(1) and (b)(2)," the "specific safe harbor with respect to the discharge of a director's duty." According to Brannon, "[t]he uncontroverted evidence was that John Cummings was the only employee of Neogence ... who had direct knowledge of the 'Verizon opportunity' and that defendants relied upon Mr. Cummings' statements regarding this opportunity." Brannon argued that sufficient evidence was presented to allow the jury to conclude that he "reasonably believed" Cummings "to be reliable and competent regarding the Verizon opportunity." The trial court denied the motion.
II. Inconsistent Verdicts
The trial court abused its discretion by not granting a new trial because of inconsistent verdicts. "The trial judge has the discretionary power to set aside a verdict when, in his opinion, it would work injustice to let it stand; and, if no question of law or legal inference is involved in the motion, his action in so doing is not subject to review on appeal in the absence of a clear abuse of discretion."
**182 Selph v. Selph , 267 N.C. 635, 637, 148 S.E.2d 574, 575-76 (1966). Therefore, an appellate court will only disturb a trial court's order on a Rule 59 motion when the court "is reasonably convinced by the cold record that the trial judge's ruling probably amounted to a substantial miscarriage of justice." In re Will of Buck , 350 N.C. 621, 625, 516 S.E.2d 858, 861 (1999) (quoting Anderson v. Hollifield , 345 N.C. 480, 483, 480 S.E.2d 661, 663 (1997) ). North Carolina Rule of Civil Procedure 59 designates "[a]ny irregularity by which any party was prevented from having a fair trial" as grounds for a new trial. N.C.G.S. § 1A-1, Rule 59(a)(1) (2017). For example, when a jury renders its verdicts, but "the answers to the issues are so contradictory as to invalidate the judgment, the practice of the Court is to grant a new trial, or venire de novo ." Palmer v. Jennette , 227 N.C. 377, 379, 42 S.E.2d 345, 347 (1947) (citations omitted).
Both Brannon and Rice relied on the information they received from Cummings and both made the same substantive representations to Piazza and Lampuri regarding the Verizon opportunity. Moreover, both plaintiffs talked to Cummings multiple times after their conversations with Brannon, providing them the opportunity to clarify any confusion. Neither plaintiff invested in the company until after he spoke with Cummings.
Under the securities fraud statute, the trial court instructed the jury that, to hold a defendant liable, it must find that (1) the defendant made "a statement which was materially false or misleading," and (2) the plaintiff was "unaware of the true or omitted facts." Only one person, Cummings, attended the meeting on 30 April 2010. Neither defendant Rice nor defendant Brannon was present. Both plaintiffs knew that Cummings was the only person at that meeting. Four people-Cummings, Rice, Kirkbride, and Brannon-knew what Cummings communicated to the directors about the meeting immediately after it occurred. The evidence indicates that Cummings, Rice, Kirkbride, and Brannon all communicated essentially the same message:
• A meeting occurred;
• a Verizon representative was present; and
• the Mirascape concept favorably impressed the Verizon representative, who was open to considering it further if Neogence could produce a working demo in a timely fashion.
The opportunity was time-sensitive, and, to meet the deadlines, the company needed more capital to afford additional technical staff. In sum, Cummings, Rice, Kirkbride, and Brannon all indicated that the potential opportunity was contingent on producing a working demo quickly. Even **183 with a working demo, the opportunity was still only a potential opportunity; nothing had been finalized with Verizon.
At trial Piazza, already an angel investor, testified that he first learned of the potential opportunity with Verizon through an e-mail sent by Brannon to him and others on 30 April 2010. Brannon copied Rice with the *508 email. That e-mail stated, in pertinent part, "John Cummings just had a meeting in NY with Verizon. We need $ 100K - $ 200K ASAP, [sic] in 3-4 weeks we go back to Verizon we have an oppurtnity [sic] to be their featured [software]. [Rice] is going to send out a summary later today." Piazza summarized the relevant substance of Brannon's representations as Neogence's having an opportunity to present a demo to Verizon, "[a]nd if that were acceptable to Verizon," then there would be "an opportunity to be OEMed or featured AR or pre-installed on every Verizon-Verizon Droid phone." As for his communications with Rice, Piazza testified that on the evening of 30 April 2010, he also received the forecast e-mail from Rice, which reiterated: "The opportunity here is to become the featured AR application for Verizon, OEM'd on all of the DROID smartmobiles, and leverage their marketing."
After receiving the e-mails from Brannon and Rice, Piazza immediately talked with Cummings about what had occurred at the 30 April 2010 meeting. Before investing on 28 May 2010, Piazza spoke directly with Cummings, communicated with Rice, and met in person with Cummings and Kirkbride to discuss the same Verizon opportunity first mentioned by Brannon in the 30 April 2010 e-mail. Even though Cummings, Rice, Kirkbride, and Brannon communicated materially the same message to plaintiffs, interestingly, Cummings was not a named defendant here, and the trial court granted summary judgment to Kirkbride. Thus, the precise question regarding inconsistent verdicts is whether Brannon communicated a materially different message about the Verizon opportunity than Rice or whether plaintiffs had different opportunities to become "aware of the true ... facts."
In evaluating these two e-mails, it is important to appreciate the dramatically different roles of Rice and Brannon and therefore, the reasonable weight or "materiality" of each communication: Rice was the founder and CEO of Neogence, whereas Brannon was a physician serving as an outside board member without technical expertise. Part of Brannon's role as a director was to help identify potential angel investors. Both plaintiffs knew of Brannon's limited role. In his short 30 April 2010 e-mail, Brannon quickly summarized the possible Verizon opportunity and asked the recipients to take time to read the more detailed e-mail to follow from Rice. By copying Rice with the email, **184 Brannon provided Rice had an opportunity to correct any misstatement. Further, any ambiguities created by the Brannon e-mail were clarified by the more detailed Rice e-mail, which Brannon referenced and urged the recipients of his email to read.
Upon reaching its verdict regarding Piazza, to the extent that the jury found that Brannon misrepresented that Neogence had an opportunity to become Verizon's featured AR software provider, the jury reached that decision in the face of evidence that Rice made the same express representation. Nevertheless, the majority contends that Brannon "made more direct, less nuanced, comments" and gave less "accurate descriptions" to Piazza "concerning the extent to which Neogence had the opportunity to have Mirascape preloaded onto Verizon phones than Mr. Rice did." Because of this alleged distinction, the majority concludes that the jury could have reasoned that Rice did not make any misrepresentations to Piazza but that Brannon did so based on an "omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." N.C.G.S. § 78A-56(a)(2) (2017).
The majority's distinction is one without a difference. Brannon's e-mail specifically stated that the more detailed (nuanced) information about the potential opportunity would come from Rice. Brannon's short e-mail is exactly the kind of email one would expect a busy physician to send to other busy people. Rice received a copy of the email and, as the CEO, had the opportunity to correct any misstatement. Furthermore, Rice's longer, detailed communications conveyed additional information needed by the potential investors, such as the statement that Neogence might have an opportunity to "leverage [Verizon's] marketing." Regardless of the comparative length of or detail in the e-mails, Rice expressly represented that Neogence had a real chance "to become the featured *509 AR application for Verizon, OEM'd on all of the DROID smartmobiles."
Regarding Lampuri's claims, Lampuri learned of the potential Verizon opportunity from Brannon at Brannon's medical office on 25 May 2010 when the two had a brief conversation during a prenatal appointment for Lampuri's wife. This setting was not one in which a person expects to receive precise details of an investment opportunity. According to Lampuri, Brannon represented that "our director of sales just got back from New York City at a meeting"; "[t]here were Verizon executives there, and they were absolutely blown away by our technology," and "Neogence needed to go back, create this demo, come back and show Verizon, you know, what they've been talking about, what **185 they've been showing about this technology and they're going [to] get OEMed. They're going pre-installed on all Verizon phones." Afterwards, Lampuri pursued the opportunity by meeting with Cummings, Kirkbride, and Rice at Neogence's headquarters in July 2010 to learn the details of the investment opportunity directly from Cummings. Cummings confirmed the essence of Brannon's statements. According to Lampuri, Rice "reiterated to them that the [Verizon] deal was very much real. They were seeking funds to, you know, create that demo and finish it so they could do-you know, give a live demo to Verizon."
The majority argues that Rice's representations to Lampuri were obviously different than Brannon's in that Rice did not specifically detail the nature of the Verizon opportunity. Though Rice's statements to Lampuri were comparatively vague, they were no different than Brannon's given the context in which they were made. According to Lampuri's testimony, immediately preceding Rice's statement at their first meeting, Cummings had relayed that the result of his initial meeting in New York was that Verizon was "absolutely wowed by the technology, that we need-they needed to go back, create a demo, go back to Verizon in a couple weeks and if they-if they wowed Verizon, ... then they have the opportunity to be preloaded, OEMed on all phones." Just before an additional interaction with Rice, Lampuri heard from Cummings that Cummings had been in New York to meet with an advertising agency "and it just so happened Verizon executives were in the meeting, blown away by the technology. You guys need to go back, create this demo, come back to us and you guys have a possibility of being our featured AR application OEMed on all phones."
As such, Cummings's descriptions of the Verizon "deal" as reiterated by Rice were substantively indistinguishable from Brannon's representations. Indeed, the jury heard from Lampuri that Cummings "discussed and reiterated basically what Greg [Brannon] had said." Rice then effectively affirmed and adopted this description of the Verizon opportunity when he represented to Lampuri on both occasions that the "deal" was "very much real" without offering any other information to correct or modify Cummings's representations. While the majority ignores the timing of the various representations to Lampuri, it is crucial. At the time of Brannon's May statement, the Verizon opportunity deadline was weeks away. That deadline, however, passed. During this critical time, Lampuri had several discussions with Rice and Cummings. Significantly, Lampuri did not provide funds until 24 September 2010, well past the initial deadlines, and many months after Brannon's alleged misrepresentation.
**186 Also, the majority ignores the second aspect of the jury's verdict of liability that each plaintiff "was unaware of the true or omitted facts." Even if there were a "material" difference in the representations made by Rice and Brannon, neither plaintiff can show he did not learn of the true details of the Verizon opportunity by talking directly to the one Neogence person who was present at the meeting, Cummings. Before plaintiffs invested in the company, both had multiple conversations with Cummings as well as Rice and Kirkbride. These direct conversations with these corporate officers would have corrected any possible confusion Brannon, the physician without technical expertise and an outside board member, may have created regarding the potential opportunity with Verizon. No person would have reasonably relied on the statement of one absent *510 from a meeting after consulting with one actually present .
The timing of the investments makes clear that neither plaintiff relied on Brannon but only invested after extensive conversations with Cummings as well as Rice and Kirkbride. Piazza first loaned money to Neogence in February 2010, but, after talking directly with Cummings and being visited by Rice and Kirkbride, on 28 May 2010, Piazza loaned the additional $ 150,000 to Neogence. Even though his in-person communication with Brannon took place on 25 May 2010, Lampuri did not invest until 24 September 2010, four months after his brief conversation with Brannon and after he had spoken several times to Cummings, Kirkbride, and Rice about the same Verizon opportunity, and well after Neogence had missed the initial July deadline with Verizon.
Given the evidence, it is impossible to reconcile the jury's verdicts that Brannon made misrepresentations to plaintiffs, thus subjecting him to securities fraud liability, while Rice made no such misrepresentations. Given the evidence, it is likewise impossible that plaintiffs did not know of the true details of the opportunity after discussing it with the only Neogence officer present at the 30 April 2010 meeting as well as corporate officers, Rice and Kirkbride. If Rice accurately stated the potential opportunity, as the majority suggests, Rice would have simultaneously informed plaintiffs of the "true" opportunity. Because these verdicts absolve one defendant from liability and subject the other to liability based on substantively indistinguishable statements, it would be a substantial miscarriage of justice to allow these verdicts to stand. Therefore, the trial court abused its discretion by denying Brannon's motion for a new trial.
III. Director Safe Harbor Jury Instruction
The trial court erred by failing to give the requested director safe harbor jury instruction; accordingly, Brannon is entitled to a new trial **187 on this ground as well. Whether a jury instruction correctly explains the law is reviewable de novo. E.g. , Moss v. Brown , 199 N.C. 189, 192, 154 S.E. 48, 49 (1930) ; see also Kinsey v. Spann , 139 N.C. App. 370, 372, 533 S.E.2d 487, 490 (2000) (A motion for new trial involving a question of law is reviewed de novo. (citation omitted)); McNeill v. McDougald , 242 N.C. 255, 259, 87 S.E.2d 502, 504 (1955). An erroneous jury instruction of the law regarding "a substantive phase of the case is prejudicial error," White v. Phelps , 260 N.C. 445, 447, 132 S.E.2d 902, 904 (1963) (per curiam), "even though given in stating the contentions of the parties," Blanton v. Carolina Dairy , Inc. , 238 N.C. 382, 385, 77 S.E.2d 922, 925 (1953). An instruction placing the burden of proof on the wrong party is prejudicial. E.g. , Banks v. Shepard , 230 N.C. 86, 91, 52 S.E.2d 215, 218 (1949).
This Court has stated:
[W]hen a request is made for a specific instruction, correct in itself and supported by evidence, the trial court, while not obliged to adopt the precise language of the prayer, is nevertheless required to give the instruction, in substance at least, and unless this is done ... the failure will constitute reversible error.
Minor v. Minor , 366 N.C. 526, 531, 742 S.E.2d 790, 793 (2013) (alterations in original) (quoting Calhoun v. State Highway & Pub. Works Comm'n , 208 N.C. 424, 426, 181 S.E. 271, 272 (1935) ). "Accordingly, we consider whether the instruction requested is correct as a statement of law and, if so, whether the requested instruction is supported by the evidence." Id. at 531, 742 S.E.2d at 793 (citing Calhoun , 208 N.C. at 426, 181 S.E. at 272 ); see also Gwyn v. Lucky City Motors, Inc. , 252 N.C. 123, 127, 113 S.E.2d 302, 305 (1960) (The quantum of proof required to support a requested instruction is "more than a scintilla.").
a. Preservation
The first question is whether Brannon preserved the safe harbor jury instruction issue by making an adequate request to the trial court. Contrary to the majority's view, Brannon's counsel plainly raised the defense before, during, and after trial, and preserved for review the proposed jury instruction, by asserting Brannon acted within the scope of his corporate director duties in his communications with plaintiffs. The majority concludes that the pattern jury instruction incorrectly states the law by placing the burden of *511 proof on plaintiffs and, as a result, the requesting party should have produced a special written instruction. The statute, however, places the burden of proof on plaintiffs; thus, the **188 requested pattern jury instruction correctly states the law, and the trial court should have instructed the jury accordingly.
A party may not appeal a jury instruction, or lack thereof, unless the party objects and states the grounds of the objection, "provided that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury." N.C. R. App. P. 10(a)(2). Here in accordance with Rule 10(a)(2), Brannon did make a timely objection to the trial court's decision to deny the requested jury instruction at issue.
In the pretrial order, counsel defined the jury issue as, inter alia , "Were the Plaintiffs ... damaged by the failure of [defendant Brannon] to discharge his duties as a corporate director? (N.C.G.S. §[ ]55-8-30)." At the close of plaintiffs' evidence, counsel argued for dismissal in that, "as [a] director," Brannon is "shielded from liability ... in compliance with General Statute 55-8-30." At the charge conference, defense counsel requested the corresponding pattern instruction 807.50, noting again that "this statute," section 55-8-30 and its protections, "needs to be inserted" in the jury instructions. Defense counsel included in his proposed jury instructions North Carolina Pattern Instruction Civil 807.50, titled "Breach of Duty-Corporate Director." During the charge conference, defense counsel proposed N.C.P.I. Civil 807.50 to invoke the defense for a director who relies on information provided by a corporate officer pursuant to N.C.G.S. § 55-8-30. The trial court denied the proposed instruction on the basis that the instruction placed the burden of proof on plaintiffs instead of on Brannon, at which time Brannon's counsel suggested crafting a different instruction. Apparently, no acceptable instruction was presented.
Therefore, before the conclusion of the charge conference, Brannon renewed his objection to the instructions and argued the propriety of the pattern jury instructions based on N.C.G.S. § 55-8-30. The trial court noted the objection and denied the requested jury instructions. In his post-trial motions, counsel argued that Brannon, as a corporate director, "was entitled to rely on the information he received from John Cummings and repeated to plaintiffs as a matter of law," that "[o]ne of the duties of a director is seeking capital investment in the company," and that the trial court erred by instructing instead "on the general standard of reasonableness." Brannon certainly raised, and plainly preserved, this issue for appeal. See State v. Maske , 358 N.C. 40, 53, 591 S.E.2d 521, 530 (2004) ; see also N.C. R. App. P. 10(b)(2).
**189 b. Correct Statement of the Law
The next question is whether the proposed jury instruction was a correct statement of the law. The majority, agreeing with the trial court, holds that the requested instruction incorrectly stated the law because of the allocation of the burden of proof. A proper analysis requires consideration of two statutes, those addressing the director safe harbor and securities fraud.
i. Director Safe Harbor
The statutory director safe harbor necessarily protects directors in the midst of "[t]he growing complexity of business affairs," which requires "directors to rely on other corporate personnel as well as outside experts in discharging their responsibilities." Russell M. Robinson, II, Robinson on North Carolina Corporation Law § 14.05 (7th ed. 2014). In recognition of the important policy of encouraging individuals to serve as corporate directors, the General Assembly created the statutory director safe harbor to supplement the common law protection of the business judgment rule. Section 55-8-30 of our General Statutes, which governs the general conduct of corporate directors, recognizes the safe harbor as a defense for a director discharging his duties:
(a) A director shall discharge the director's duties as a director ... in accordance with all of the following:
(1) In good faith.
(2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances.
*512 (3) In a manner the director reasonably believes to be in the best interests of the corporation.
(b) In discharging the duties of a director's office, a director is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by any of the following:
(1) One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented.
N.C.G.S. § 55-8-30(a) - (b) (Supp. 2018). "A director is not entitled to the benefit of subsection (b)," that is relying on information provided by **190 corporate officers, "if the director has actual knowledge concerning the matter in question that makes reliance otherwise permitted by subsection (b) of this section unwarranted." Id. § 55-8-30(c) (Supp. 2018) (emphasis added). Otherwise, "[a] director is not liable for [ ] any action taken as a director, or any failure to take any action, if the director performed the duties of the director's office in compliance with this section." Id. § 55-8-30(d) (Supp. 2018). Thus, under the statute, a director discharging his corporate duties is entitled to rely in good faith on a corporate officer's representation without incurring personal liability, absent actual knowledge that the statement is false.[6] *513 **191 To assert this defense Brannon requested North Carolina Pattern Instruction Civil 807.50, titled "Breach of Duty-Corporate Director." The proposed instruction included the following language:
"Was the plaintiff damaged by the failure of the defendant to discharge his duties as a corporate director?"
On this issue the burden of proof is on the plaintiff. This means that the plaintiff must prove , by the greater weight of the evidence ...:
....
... that the defendant failed to act as an ordinarily prudent person in a like position would have acted under similar circumstances. (Unless he has actual knowledge to the contrary, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by
[one or more employees of the corporation who the director reasonably believes to be reliable and competent in the matter(s) presented]
**192 (Emphasis added.) (Footnote call numbers and italics omitted.) Defense counsel submitted the proposed instruction to the trial court, which declined to give it because the proposed instruction placed the burden of proof on plaintiffs. This decision was error because the trial court misapplied, and now the majority misapplies, the securities fraud statute in light of the director safe harbor provision.
ii. Securities Fraud
The securities fraud statute, N.C.G.S. § 78A-56(a)(2), pled by plaintiffs, states that a person who:
(2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission,
is liable to the person purchasing the security from him ... upon the tender of the security....
N.C.G.S. § 78A-56(a)(2) (2017). This statute is directed at those who are personally and financially profiting from the transaction. See Pinter v. Dahl , 486 U.S. 622, 654, 108 S. Ct. 2063, 2082, 100 L.Ed.2d 658, 687 (1988) ("Typically, a person who solicits the purchase will have sought or received a personal financial benefit from the sale, such as ... a brokerage commission." (citation omitted)). The express language says liability extends to the person "purchasing the security from him." Here, while as a director, Brannon encouraged plaintiffs to invest in Neogence, plaintiffs "purchased" the securities from the company with the prompting of the corporate officers, Rice, Kirkbride, and Cummings.
There are real questions regarding the applicability of this statute to an outside director who, acting for the corporation, seeks investments without receiving any personal gain. The actual seller of the security was Neogence, not Brannon. Brannon had no authority to accept the loans from investors or to sign the promissory note agreements. And if Brannon is a seller, what degree of knowledge (scienter) is required? Further, securities *514 fraud is not a strict liability offense, and a plaintiff must prove that he would not have purchased the security absent the **193 material misrepresentation. Finally, does this statute make an outside director who did not issue the note primarily liable, or would N.C.G.S. § 78A-8(2) or N.C.G.S. § 78A-56(c) be correct statutes to assess an outside director's liability? See N.C.G.S. § 78A-8(2) (2017) (imposing liability on "any person, in connection with the offer, sale or purchase of any security, directly or indirectly," who made a material misrepresentation or omission "in light of the circumstances" and upon which a plaintiff relied); N.C.G.S. § 78A-56(c)(1) (2017) (providing for potential secondary joint and several liability for an implicated "director").[7] Regardless, the necessary analysis here does not require resolution to these significant questions.
Reading the director safe harbor statute in para materia with the securities fraud statute, the Court must resolve the conflict regarding which party bears the burden of proof, or in other words, which party must show whether the director exercised reasonable care. The trial court concluded, and now the majority affirms, that the securities fraud statute places the burden of proof on defendant, eliminating the significant protections of the director safe harbor statute. I disagree. In light of the significant public policy considerations that clearly favor the need for outside directors and their protection, the correct reading of the statute requires plaintiff to prove that the director acted without reasonable care in relying on the representations of a corporate officer. Thus, the requested pattern jury instruction is correct; there was no need for a written special instruction. The majority's assertion that defendant's director safe harbor defense "was a subordinate feature of the present case" ignores the fact that Brannon raised the defense at every opportunity.
As a director discharging his corporate duties by introducing potential angel investors to Neogence, Brannon is entitled to rely in good faith on the corporate officers' representations without incurring personal liability, absent actual knowledge that those statement were false. Plaintiffs bear the burden of proving otherwise. The director safe harbor instruction was appropriate because there was sufficient evidence that Brannon's conduct falls within the scope of its protection. The trial court erred in denying Brannon's request for that jury instruction.
**194 Plaintiffs' own complaint, as well as the parties' stipulations in the pretrial order, recognize and affirm that "at all relevant times material to this action, Kirkbride, Brannon, and Rice served on Neogence's board of directors." See Ussery v. Branch Banking & Tr. , 368 N.C. 325, 340, 777 S.E.2d 272, 282 (2015) ("[A] plaintiff's ... assertions cannot overcome his own evidence to the contrary."). Brannon presented ample evidence that the solicitation of start-up funds for Neogence falls squarely within the scope of his duties as a corporate director. See State v. Harvell , 334 N.C. 356, 364, 432 S.E.2d 125, 129 (1993) ("If a request is made for a jury instruction which is correct in itself and supported by evidence, the trial court must give the instruction...."). In fact, Neogence recruited Brannon as an outside director precisely for this purpose. See Burlington Indus. v. Foil , 284 N.C. 740, 758, 202 S.E.2d 591, 603 (1974) ("The business and affairs of a corporation are ordinarily managed by its board of directors." (citation omitted)); see also N.C.G.S. § 55-8-30 official cmt. (2017) (noting "the board may delegate or assign to appropriate [representatives] of the corporation the authority or duty to exercise [certain] powers"). Kirkbride invited Brannon to the board to secure "financing, investors, et cetera." Rice stated that Brannon "would make introductions to people that might have an interest in what [Neogence was] doing." As Brannon characterized it, he would "expos[e] this company to friends that may want to invest into it."
*515 Brannon received no commissions or independent compensation for his solicitation efforts. See Smith v. Van Gorkom , 488 A.2d 858, 872-73 (Del. 1985) (en banc) (Generally, a director only acts outside of those corporate duties when he or she acts for his or her own personal gain, or in bad faith or self-interest.), overruled on other grounds by Gantler v. Stephens , 965 A.2d 695, 713 n.54 (Del. 2009) (en banc); see also Pinter , 486 U.S. at 654, 108 S. Ct. at 2082, 100 L.Ed.2d at 687 ("Typically, a person who solicits the purchase will have sought or received a personal financial benefit from the sale, such as ... a brokerage commission." (citation omitted)). By stating his understanding of the Verizon opportunity, Brannon encouraged, but did not otherwise participate in, the investments.
Moreover, Brannon presented ample evidence that he relied on Cummings's statements to the directors. See Harvell , 334 N.C. at 364, 432 S.E.2d at 129. The complaint itself reveals that Brannon did so, stating, "On or about April 30, 2010, Brannon sent an e-mail to ... investors stating that Neogence's chief sales officer, John Cummings ('Cummings'), 'just had a meeting in NY with Verizon....' " Only after Cummings reported to the board and directors regarding the Verizon opportunity did the directors, not just Brannon, solicit funds from plaintiffs.
**195 Moreover, plaintiffs made their loans to Neogence following their in-person meetings with Cummings, which Brannon did not even attend.
Brannon's directorial conduct is precisely at issue, which plaintiffs' own complaint contemplates and in support of which defense counsel presented evidence and argued before the trial court. If Brannon acted as a director and did not know the statement was false or misleading, he was entitled to rely in good faith upon it. See N.C.G.S. § 55-8-30 official cmt. ("[A] director is not liable for injury or damage ..., no matter how unwise or mistaken ..., if in performing his duties he met the [conduct] requirements of section 8.30."). Plaintiffs bear the burden of establishing either that Brannon was not acting within the scope of his directorial duties, and hence the safe harbor protection does not apply, or, to rebut the good faith presumption, that he acted with gross negligence or with actual knowledge that Cummings's representations were false. In fact, the trial court further misstated the law by instructing the jury that "a defendant is liable for making a false or misleading statement in soliciting the purchase of a security even if he did not know that [Cummings's] statement was false or misleading."
Providing adequate protection for outside directors is a fundamental consideration in the corporate context. Brannon did not waive his statutory rights under the director safe harbor, see State ex rel. Long v. ILA Corp. , 132 N.C. App. 587, 602, 513 S.E.2d 812, 821 (1999) ; see also N.C.G.S. § 55-8-30 official cmt. sec. 4, and is entitled to a proper jury instruction on his role as a corporate director.
The majority's unnecessarily restrictive reading of the Safe Harbor provision will discourage qualified persons from agreeing to serve as unpaid, independent outside directors for corporate governance. If a director, particularly an independent outsider, cannot rely upon the statements of company employees, officers, and consultants in soliciting funds without being subject to securities fraud liability the majority imposes here, there is little incentive to serve at all.
Piazza v. Kirkbride , 246 N.C. App. 576, 623, 785 S.E.2d 695, 724 (2016) (Tyson, J., concurring in part and dissenting in part).
IV. Conclusion
Brannon's statements to plaintiffs were materially the same as those of Rice. Plaintiffs did not solely or primarily rely on Brannon's statements about the Verizon opportunity but consulted directly with the one **196 person who was present at the meeting, Cummings, as well as corporate officers Rice and Kirkbride. The verdicts holding Brannon responsible, but not Rice, are irreconcilable and result in a substantial miscarriage of justice. Furthermore, Brannon, as a corporate director, was entitled to the director safe harbor instruction, which was properly preserved and erroneously denied by the trial court. As a result, Brannon should be *516 granted a new trial. Accordingly, I respectfully dissent.

Generally, an "outside director" is "[a] nonemployee director with little or no direct interest in the corporation." Director , Black's Law Dictionary (10th ed. 2014).

An "angel investor" is "[a] person-usu[ally] an experienced and successful entrepreneur, professional, or entity-that provides start-up or growth financing to a promising company." Investor , Black's Law Dictionary (10th ed. 2014). In general, an "accredited investor" is a person with a minimum net worth of over $ 1,000,000 or annual income in excess of $ 200,000, 17 C.F.R. § 230.501(a)(5), (6) (2017), and is treated as "being knowledgeable and sophisticated about financial matters," investor , Black's Law Dictionary (10th ed. 2014). Herein an "accredited angel investor" is referred to as simply an "angel investor."

The purchase agreement also discloses that the promissory notes and any underlying securities "have not been registered under the Securities Act of 1933" and that the sale and issuance of securities are "exempt" from such registration.

Plaintiffs voluntarily dismissed without prejudice their other claims against all defendants for common law fraud, negligent misrepresentation, and unfair and deceptive trade practices.

If the jury found that either defendant had made materially false or misleading representations to either plaintiff, the jury was also asked to determine: "Did the Defendant, [name], not know and in the exercise of reasonable care, could not have known of the untruth or omission in his offer or sale of a security to the Plaintiff, [name]?" The jury answered no as to Brannon and each plaintiff, but it did not reach the question regarding Rice because it had not found that Rice made any statement which was materially false or misleading.

Providing further insight into the importance of the director safe harbor statute, North Carolina's common law business judgment rule likewise protects corporate directors from personal liability stemming from the performance of their corporate duties. Braswell v. Pamlico Ins. & Banking Co. , 159 N.C. 628, 631, 75 S.E. 813, 814 (1912) ("Directors of corporations are not guarantors.... They do not insure the corporation against loss arising either from their own honest mistakes or from the mistakes of subordinate officers."). Injured parties are generally free to sue the corporation itself, but "[d]irectors must have the freedom to take risks and the power to manage the business without undue interference from ... the courts. That freedom is achieved by protection from liability for good faith errors in judgment and deference from the courts in business decisions." First Union Corp. v. Suntrust Banks, Inc. , Nos. 01-CVS-8036, CIV. A. 01-CVS-4486, 2001 WL 1885686, at *4 (N.C. Super. Ct. Aug. 10, 2001).
Likewise, other states echo these fundamental principles embodied in the "business judgment rule," State ex rel. Comm'r of Ins. v. Custard , No. 06 CVS 4622, 2010 WL 1035809, at *20-21 (N.C. Super. Ct. Wake County (Bus. Ct.) Mar. 19, 2010), which operates both procedurally and substantively, Emerald Partners v. Berlin , 787 A.2d 85, 90-91 (Del. 2001) ; see also In re Citigroup Inc. S'holder Derivative Litig. , 964 A.2d 106, 123 (Del. Ch. 2009) ("[I]f the directors employed a rational process and considered all material information reasonably available-a standard measured by concepts of gross negligence"-no personal liability extends. Moreover, "a showing of bad faith is a necessary condition to ... liability.").
Substantively similar to N.C.G.S. § 55-8-30(b), the common law business judgment rule provides directors a "safe harbor" which allows them to rely in good faith upon the representations of their corporation's officers. See Arthur v. Griswold , 55 N.Y. 400, 406 (1874) ("The mere fact of being a director ... is not per se sufficient to hold a party liable for the frauds and misrepresentations of the active managers of the corporation. Some knowledge of ... the act claimed to be fraudulent must be brought home to the [director] charged." (citation omitted)); see also, e.g. , Utley v. Hill , 155 Mo. 232, 242-47, 273-76, 55 S.W. 1091, 1092-93, 1103-04 (1900) (Bank directors were not liable for deceit because they relied in good faith on financial reports of cashier.).
Like N.C.G.S. § 55-8-30(c), absent actual knowledge of the falsity of the officer's representation, the business judgment rule shields directors from personal liability in this context. See Brehm v. Eisner , 746 A.2d 244, 261-62 (Del. 2000) (en banc); see also Graham v. Allis-Chalmers Mfg. Co. , 41 Del. Ch. 78, 85, 188 A.2d 125, 130 (Del. 1963) ("[D]irectors are entitled to rely on the honesty and integrity of their subordinates until something occurs to put them on suspicion that something is wrong.").
Though similar, the statutory protection is separate from the business judgment rule and does not supplant its common law protections. State ex rel. Long v. ILA Corp. , 132 N.C. App. 587, 601, 513 S.E.2d 812, 821 (1999) ("[Section 55-8-30 ] does not abrogate the common law of the business judgment rule."); see N.C.G.S. § 55-8-30 official cmt. (1991) ("[T]he business judgment rule and the circumstances for its application are ... developed by the courts.... [S]ection 8.30 does not ... codify the business judgment rule...."). "The possible application of the business judgment rule need only be considered if compliance with the standard of conduct set forth in ... section 8.30 is not established." N.C.G.S. § 55-8-30 official cmt. sec. 4. Therefore, "proper analysis requires examination of defendant's actions in light of [both] the statutory protections ... and the business judgment rule, either or both of which could potentially insulate him from liability." ILA Corp. , 132 N.C. App. at 601-02, 513 S.E.2d at 821.
As a procedural hurdle, a plaintiff must "rebut the presumptive applicability of the business judgment rule" to pursue a personal claim against a corporate director. Emerald Partners , 787 A.2d at 91 ; accord Unitrin, Inc. v. Am. Gen. Corp. , 651 A.2d 1361, 1374 (Del. 1995) ; ILA Corp. , 132 N.C. App. at 602, 513 S.E.2d at 821-22 (citation omitted). The rule thus "places the initial burden of proof on the plaintiff," Emerald Partners , 787 A.2d at 91 (quoting Cinerama, Inc. v. Technicolor, Inc. , 663 A.2d 1156, 1162 (Del. 1995) ), by requiring an affirmative showing that "the board of directors, in reaching its challenged decision, violated" the board's directorial duties, id. ; see also Unitrin, Inc. , 651 A.2d at 1374 ("[T]he plaintiff has the initial burden of proof and the ultimate burden of persuasion."); ILA Corp. , 132 N.C. App. at 602, 513 S.E.2d at 821-22 (same). The presumption "is rebutted [only] in those rare cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.' " Parnes v. Bally Entm't Corp. , 722 A.2d 1243, 1246 (Del. 1999) (en banc) (quoting In re J.P. Stevens & Co. S'holders Litig. , 542 A.2d 770, 780-81 (Del. Ch. 1988) ).

The majority states, "This Court has 'consistently denied appellate review to [parties] who have attempted to assign error to the granting of their own requests.' " (quoting State v. Wilkinson , 344 N.C. 198, 213, 474 S.E.2d 375, 383 (1996) ). Just recently, however, this Court allowed and upheld a challenge to an instruction submitted by the party who subsequently objected. See Justus v. Rosner , --- N.C. ----, ----, 821 S.E.2d 765, 769-72 (2018) ; id. at ----, 821 S.E.2d at 780-81 (Newby, J., dissenting).